**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**
Plaintiff,

v.

**E. F. HUTTON & COMPANY, INC., et al., Defendants.**

Civ. A. No. 5–71746.

United States District Court,
E. D. Michigan, S. D.

Nov. 10, 1975.

Douglas G. Graham, Detroit, Mich., for plaintiff.

Thomas F. Curnin, Cahill Gordon & Reindel, New York City, Robert S. Krause, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

PHILIP PRATT, District Judge.

This action was instituted by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a Delaware corporation with its principal place of business in New York, against four former account executives [1] ("individual defendants"), who are Michigan residents, and E. F. Hutton & Company, Inc. ("Hutton"), a Delaware corporation with principal place of business in New York, seeking temporary and permanent injunctive relief, as well as damages, for alleged violation of the Sherman Act [2], and for breach of contract and tortious unfair competition.

The basic contours of the controversy are largely undisputed and may be summarized as follows. The individual defendants were employed by Merrill Lynch as account executives for a number of years. During their tenure with plaintiff, they specialized in the investment vehicles of option writing and trading. Three of the individual defendants [3] executed agreements [4] with Merrill Lynch, which provided, *inter alia*, that, "all records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the proper-

ty of Merrill Lynch," and that said records "shall not be removed from the premises of Merrill Lynch either in original or in duplicated or copied form." Moreover, Merrill Lynch furnished a "Compliance Outline" to each account executive which outlines the confidential nature of the accounts.[5] It emphasizes the importance of protecting the clients' interests[6] by careful maintenance of confidentiality. Each of the individual defendants acknowledged in writing that he had read the outline.

On August 29, 1975, the individual defendants tendered their resignations to Merrill Lynch and on September 2, 1975, they commenced employment as account executives with Hutton. The events and occurrences attendant upon and consequent to those resignations form the subject matter of this lawsuit. In particular, the dispute concerns the copying of certain documents, expecially the "option ledgers," [7] by the individual defendants. In addition, it focuses upon the defendants' use of the information contained in the documents and their contacts[8] with customers who sought investment services at Merrill Lynch.

Despite the fact that many of the pertinent underlying facts are at issue,[9] it is helpful to summarize the bases of the action, as set forth in the five-count complaint. Count I alleges violation based on the Sherman Act against all defendants; Count II is premised on unfair competition and seeks relief against all defendants; Count III alleges tortious interference against Hutton; Count IV charges the individual defendants with breach of contract;

---

1. James Bond, Paul Camilleri, Arthur Ciagne and John Kulhavi.

2. 15 U.S.C. § 1.

3. Kulhavi, Camilleri and Bond.

4. Exhibits A–C of Complaint.

5. Exhibit 1 to plaintiff's motion.

6. Thus, for instance, the booklet admonishes that, "The confidentiality of our *customers' financial affairs* is one of the foundations of our business."

7. The Brandt affidavit refers to the ledgers (¶ 10), as well as mutual fund statements and other records (¶ 13). Defendants' affidavit denies that they took mutual fund statements and diverse other records.

8. See Exhibit D to complaint.

9. There are, for instance, disputes concerning the documents which defendants have in their possession, and the precise manner in which the information has been used. (Compare affidavits of Richard Brandt and joint affidavit of individual defendants).

Count V alleges breach of fiduciary duty against the individual defendants. The prayer under each count seeks injunctive relief.

Plaintiff has brought the instant motion for a preliminary injunction which seeks relief:

1. Requiring defendants to return "all records and documents together with (a) all copies made . . . and (b) all notes . . . which . . . relate to . . . any of the information . . ."

2. Prohibiting "defendants, their employees, and agents, from using or disclosing" any of said items.

3. Prohibiting "defendants, their employees, and agents . . . from contacting, soliciting, and competing for the business of any of the persons as to whom information is set forth in any of said items."[10]

Defendants, by way of response, have filed motions pursuant to F.R.C.P. 12(b)(1) and (6), to dismiss Counts I and IV for failure to state a claim, and Count III for lack of federal jurisdiction.[11] Moreover, they have filed and asserted vigorous objections to the granting of a preliminary injunction. It is the preliminary relief to which the Court now addresses its attention.

█ It is a firmly engrained jurisprudential principle that the grant of a preliminary injunction within the sound discretion of the trial court is an "extraordinary exercise of judicial power . . . used only in the most compelling cases." (*Thompson v. Chrysler Corp.*, 382 F.Supp. 1317, 1319 (E.D. Mich.1974)). Consequently, a party seeking to invoke the relief bears the burden of demonstrating the existence of four crucial prerequisites: (1) a substantial likelihood that the moving party will prevail on the merits; (2) irreparable injury; (3) overriding harm to plaintiff relative to defendant if relief is granted; (4) the public interest is served by issuance of the relief. (*North Avondale Neighborhood Ass'n. v. Cincinnati*, 464 F.2d 486, 488 (6th Cir. 1972); *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972)). Analysis of this controversy in light of the foregoing criteria convinces this Court that plaintiff has not sufficiently borne its burden.

*(1). Substantial Likelihood of Success*

█ Plaintiff seeks three prongs of injunctive relief, which it denominates "Relief 1, 2, and 3." In considering the probability of plaintiff's ultimate success, it is necessary to examine the underpinnings of each prong. Relief 1 and 2 appear to be grounded in unfair competition (Count II), inasmuch as the only case law cited in support of the relief deals with that aspect of plaintiff's claim. More specifically, the legal arguments proferred by plaintiff in support of its claim[12] deal exclusively with misappropriation of business information in the nature of trade secrets.[13] (See

---

10. See pages 4 and 5 of plaintiff's brief in support of motion.

11. Those motions remain under consideration and will be ruled upon by the Court at a later date.

12. Pages 5 and 6 of plaintiff's brief.

13. This Court is aware that the rubric "unfair competition" subsumes a number of distinct torts, one of which is misappropriation of trade secrets. Furthermore, it is aware that the complaint refers to disparagement and interference with customer relations (¶ 12). However, neither of those torts appear to form the foundation of this motion. The casual allusion to such other torts (page 4 of brief) without presentation of supporting legal materials in the body of the brief, or at oral argument, indicates that plaintiff is not invoking those doctrines as the basis for its relief. Moreover, even were the Court to treat those torts as legal underpinnings of the instant motion, it would be hard-pressed to find demonstrable success on the merits. The only supports for its claim of disparagement are conclusory, based on hearsay, and without evidentiary confirmation. (Compare ¶ 16 of Brandt affida-

*Grand Union Tea Co. v. Dodds,* 164 Mich. 50, 128 N.W. 1090 (1910); *Federal Laundry Co. v. Zimmerman,* 218 Mich. 211, 187 N.W. 335 (1922); *Burger Creamery v. Deweerdt,* 263 Mich. 366, 248 N.W. 839 (1933); *Tobacco Co. v. Dept. of Revenue,* 322 Mich. 519, 34 N. W.2d 54 (1948)). Relief 3, on the other hand, is explicitly premised on breach of fiduciary duty (Count V). More particularly, it relies upon the contention that the individual defendants, while still in the employ of plaintiff, as well as thereafter, breached confidences. (See *Shwayder Chem Metal v. Baum,* 45 Mich.App. 220, 206 N.W.2d 484 (1973); *New England Overall Co. v. Woltmann,* 343 Mass. 69, 176 N.E.2d 193 (1961)). The question at bar, then, is whether plaintiff has adequately demonstrated substantial likelihood of success with regard to Counts II and V.

A factor in this Court's determination is the pendency of defendants' substantial motion to dismiss Count I. Should defendants prevail at this time, or on a subsequent motion for summary judgment, they may have eliminated the only viable federal count.[14] Accordingly, the four remaining counts might be more appropriately adjudicated in a state forum. While such action would not necessarily dispute the merits, it would remove this Court's authority to determine the controversy. Hence, the potential for such an eventuality cannot be ignored.

In support of its first two forms of relief, plaintiff argues that the documents, and information contained therein, which the individual defendants copied for use after the termination of their employment with plaintiff, were valuable and unique assets of its business, akin to trade secrets. The documents which appear to be specifically in issue are "option ledgers," which contain information concerning the kind and class of option, starting price, expiration date, and profit and loss data.[15] The bases of plaintiff's claim are the agreements which make such records the *property* of Merrill Lynch, and the confidentiality guidelines of the "Compliance Outline," which plaintiff asserts indicate that the ledgers are valuable assets of its business.

However, plaintiff has not adequately demonstrated probable success on the merits. The agreements may establish a contractual property interest in the documents, but such an interest may not necessarily be equated with an asset in the nature of a trade secret. Moreover,

---

vit with actual letter sent (Exhibit D of Complaint)). With regard to any claim of interference with customer relations, (See *Callman, The Law of Unfair Competition, Trade Mark, and Monopolies,* (1965), § 33.-3), the plaintiff must establish intent and that the action is an unfair—as opposed to normal—incident of competition. (*Id.* § 34.-1–.2). Proof regarding the latter element is particularly inconclusive, if not non-existent in this record. Furthermore, defendants have submitted affidavits which tend to indicate that solicitation of customers by their account executives who join another brokerage firm is quite normal. (See joint affidavit, ¶ 23, affidavit of Mahlon Frankhauser). Parenthetically, it should be noted that the agreement signed by three defendants contains a promise not to solicit. However, that contract is contested by way of motion to dismiss. Moreover, assuming its validity, it may well only furnish the basis for a breach of contract claim, but not for

tort, if the industry practice dictates otherwise. It would, then, be perfectly conceivable to breach a contract, but not to compete unfairly, by solicitation.

14. Both plaintiff and defendant Hutton are residents of New York and Delaware. Hence, any court to which Hutton is an indispensable party would not have an independent basis of jurisdiction. Counts II and III clearly have no independent basis. Moreover, Counts IV and V, though only pled against the individual defendants, also appear to seek relief against defendant Hutton. Plaintiff's citation of Restatement of Agency 2d, § 312, Comment C, and its repeated statements at oral argument that its relief embraces Hutton, gives rise to the conclusion that Hutton is indispensable. Its citizenship, then, is a factor in determining diversity.

15. Brandt Affidavit, ¶ 10.

an interest in maintaining confidentiality may not, in itself, necessarily elevate information to the status of a trade secret. Importantly, the determination of whether a trade secret is involved entails a multifaceted inquiry (See, e. g., *Restatement of the Law of Torts*, § 757, Comment b) of the facts. While the confidentiality guidelines may be a factor in that determination, they are not the exclusive factors. The plaintiff has failed to develop the other variables which may bear on the question.

Even more crucial, however, are the countervailing considerations which defendants have presented. The affidavits offered by defendants, not seriously controverted by plaintiff, establish that it is the usual practice for account executives to retain photocopies of records when they change employers.[16] Furthermore, the individual defendants indicate that removal of records and solicitation of clients is consistent with industry practice, and that plaintiff has, in fact, sanctioned such action.[17] Moreover, defendants state that the documents in question were devised by them, and were not records required by plaintiff.[18] Finally, defendants state, relying on the affidavits of 91 individual clients for support, that the records in question relate to accounts which they had personally obtained and not to accounts given to them by plaintiff,[19] and that they took only information pertaining to customers whom they felt would wish to continue their services. Defendants' statements are reinforced by the individual affidavits of clients, who state that they consider the individuals as their personal brokers, and that they are desirous of maintaining their relationship with individual defendants. They further state that they want only *these brokers* to keep and maintain their records.

The information furnished by defendants challenges the plaintiff's argument in three critical respects. First, in outlining the trade practice, the development of the documents, the accounts, and the customers' preferences, it casts doubt upon plaintiff's proprietary claim to the copies [20] of the documents. Thus, it would be difficult for this Court to find, with any degree of assurance at this stage, that the documents are valuable assets *of plaintiff's business*. Secondly, the fact that copies of such documents are made as a matter of course, and that, in the usual conduct of business, customers may identify with the account executives more than with the brokerage firm, certainly subjects any claim of "trade secret" to question. Thirdly, the Court is mindful that the tort of unfair competition, which involves a "violation of good morals" (*Callman, supra*, § 4.3), is premised fundamentally upon notions of fair play. In view of the trade practice, and plaintiff's adherence to that practice, a finding now that a tort was probably committed would be imprudent. Accordingly, plaintiff's first two claims for relief must be denied.[21]

16. Affidavit of Mahlon Frankhauser.

17. Joint affidavit, ¶¶ 23–24.

18. Joint affidavit, ¶¶ 12, 15, 16. See also Supplemental affidavit of Richard Brandt, which says that the option ledgers, though designed by defendants, were approved as to form by plaintiff.

19. Joint affidavit, ¶ 10.

20. It is conceded that all originals are in the possession of Merrill Lynch.

21. Plaintiff contends that the information relative to trade practice may not be considered by the Court, because it is inadmissible as parol evidence to vary the terms of the agreement. In the first place, this Court is not in a position to make such a determination. However, the purpose for which the Court has utilized the affidavits is not to alter or explain contractual terms. Rather it is to highlight the context of the situation at bar, with an eye to determination of whether defendants' actions were *tortious*. It is entirely conceivable that defendants have breached a contractual obligation without committing a tort. It is, therefore, possible that the terms of the agreement, standing intact, with no parol modification, serve only to establish a contractual promise not to

With regard to the legal theory underlying its third claim, namely breach of fiduciary duty, the Court discerns many of the same weaknesses. Plaintiff essentially argues that defendants have disclosed confidential information both prior and subsequent to their termination of employment. In particular, the trade practice of copying, and loyalty to one's personal broker, as well as the manner of developing and keeping the record contests the claim that the documents contained information confidential *to plaintiff's business*. Moreover, the nature of the Confidentiality Guidelines gives this Court occasion to pause with regard to the probable success on the issue of fiduciary breach. The Confidentiality Guidelines evidence a concern *for protecting clients*. The thrust of the material is to the effect that disclosure of client data, in breaching a client confidence, will damage the brokerage firm. The gravamen of the fiduciary breach may not be simple disclosure of business information, so much as injury to clients, with business-related repercussions. The fiduciary duty, then, may consist of harm to the principal *by disclosing or copying information against clients' wishes*. However, plaintiff in the instant case has shown no significant breach of confidence of that type.[22] In fact, the evidence is to the contrary. Some ninety-one clients have submitted affidavits clearly stating that they wish defendants to service their accounts and keep their records. In the face of such evidence indicating that the clients do not consider a breach of confidence to have resulted, this Court cannot find that defendants have probably disregarded the interests of clients to the detriment of plaintiff. Nor can this Court be persuaded, in light of the prevailing trade practice, that plaintiff has

adequately demonstrated breach of business confidentiality in the larger sense apparently asserted.

In reaching that conclusion, the Court is not unmindful of the possibility that plaintiff may have suffered injury attributable to the actions of defendants. However, plaintiff has not at this point sustained its burden of attributing any such injury to a breach of client confidentiality.

Plaintiff's claim that defendants were engaged in double dealing *prior to* their termination falls prey to the same infirmities. In addition, plaintiff has not adequately demonstrated the existence of such a breach. Although the general rules pertaining to fiduciary duties for the duration of an agency (See *Restatement of the Law 2d, Agency*, § 387 et seq.), include the duty not to disclose confidential information (*Id.* § 395), it is not clear that defendants actually violated their duty prior to termination. In particular, plaintiff has not satisfactorily established that defendants "used" or "communicated" confidential information during the course of their agency within the meaning of § 395. Plaintiff's assertions of foul play are largely hearsay.[32] In contrast, defendants, and the individual customers, deny any such claims as matters of personal knowledge. Moreover, plaintiff's offer of proof establishes only that some copying, charged to Hutton, occurred at the request of the individual defendants, in the first two weeks of August, 1975. There is no affirmative proof that the materials were put into the possession of Hutton, or were otherwise used by defendants in an untoward manner at that time. Thus, there remains a substantial question as to whether defendants were simply making arrangements to compete,

---

copy. However, unless breach of contract is a tort (a theory neither pled nor argued), the contract itself need not be germane to the claim of unfair competition. Hence, the Court need not, and does not, decide the parol evidence issue.

**22.** There are only conclusory, hearsay statements to that effect in the Brandt affidavit (¶ 18–19). The single letter of a disgruntled client attached to the affidavit pales by comparison to defendants' 91 individual affidavits.

**23.** Brandt Affidavit, ¶ 18.

or engaging in proscribed forms of competition (See, *Restatement, supra,* § 393, Comment e). The existence of such a question is sufficient to defeat plaintiff's motion at this time.

### (2). *Irreparable Injury*

■ Plaintiff's presentation of an irreparable injury has also been incomplete. Its theory was neither pled nor briefed in the first instance with particularity. However, its assertion, as formulated at oral argument, appears to focus upon the property interest of plaintiff, as espoused in the cases cited:

> Plaintiff claims that its lists of customers are in the nature of trade secrets . . . and that their secrecy is a valuable property right of which plaintiff may not be deprived . . . (*Tobacco Co., supra,* at 524 [34 N.W.2d 54]. See also *Federal Laundry, supra,* at 214 [187 N.W. 335]).

Accepting, for purposes of argument, the suggestion of *Tobacco Co.* that a property interest of that type could support the grant of preliminary injunctive relief,[24] it is important to note that that case, in finding that no injury *had even been alleged,* neither dispenses with the need to show palpable injury nor abrogates the traditional requisites of irreparability. Hence, a claim based entirely on the existence of a property right without some attendant injury, is unpersuasive. Moreover, any consideration of its validity would be offset, in the case at bar, by the weakenesses in plaintiff's demonstration of probable success. The question, then, is whether plaintiff has shown irreparable injury.[25]

■ The same conclusions obtain to plaintiff's assertion that the fiduciary breach provides the requisite harm. Breach, per se, especially with its present weaknesses, does not provide injury. Plaintiff must make a showing of irreparable injury.

■ Basically, the concept of irreparable injury turns upon the inadequacy of compensatory damages (*Nuclear-Chicago Corp., supra*). Thus, mere loss of profits (*Virginia Airmotive Ltd. v. Canair Corp.,* 393 F.2d 126 (4th Cir. 1968); *Tele-Controls, Inc. v. Ford Industries,* 388 F.2d 48 (7th Cir. 1967), or relative deterioration of competitive position (*Sanders v. Air Line Pilots Assoc.,* 473 F.2d 244 (2d Cir. 1972) ), do not in themselves suffice. The moving party must demonstrate a noncompensable injury, for which there is no legal measure of damages, or none that can be determined with a sufficient degree of certainty (4 *Pomeroy, Treatise of Equity Jurisprudence,* § 1401, at 1033–34). The injury must be both certain and great (*Washington Capitols Basketball Club v. Barry,* 304 F.Supp. 1193 (N.D. Cal.1969), aff'd 419 F.2d 472 (9th Cir. 1967); *West Coast Construction Co. v. Oceano Sanitary District,* 311 F.Supp. 378 (N.D.Cal.1970) ); it must be actual, and not merely theoretical. (*ALK Corp. v. Columbia Pictures Industries,* 440 F. 2d 761 (3rd Cir. 1971) ).

■ Judged according to the foregoing principles, plaintiff's showing of irreparable injury is inadequate. In the view of the Court, there appear to be two sources of possible injury: (1) plaintiff's inability to use the documents; (2) defendants' possession and use of them.

The first source of injury is eliminated by the fact that it is agreed that all originals of the documents are in the

---

24. That case involved the denial of a preliminary injunction in which plaintiff claimed valuable property interest. The court affirmed the denial on the ground that no injury had been shown.

25. Thus, the claim of infringement of a valuable property right, without more, does not justify preliminary injunctive relief. (See, e.g., *Nuclear-Chicago Corp. v. Nuclear Data, Inc.,* 465 F.2d 428 (7th Cir. 1972) (patent); *Foundry Services v. Berflux Corp.,* 206 F.2d 214 (2d Cir. 1953) (license)).

possession of plaintiff. Therefore, plaintiff is in no sense deprived of the benefits or use of the information.

As to the second source, plaintiff emphasizes loss of competitive advantage, or profits, and creation of the impression that the customers are clients of the individual defendants who must, in the ordinary course, follow the defendants to their new place of employment.

As to the assertions of lost profits, it is clear that plaintiff has adequate legal recourse. Its claim that the loss of primary commissions is unascertainable is conclusory and does not comport with prevailing concepts of damages. Its alleged loss of secondary customer referrals would, if proven, be calculable. However, the claim is wholly unsupported by any evidence in this record. It is, for these purposes, speculative, and remains in the realm of the theoretical. Moreover, plaintiff has not completely borne its burden of showing that its injury is "great." Thus, while plaintiff indicates that the individual defendants generated some $400,000 of commission revenues during the first six months of 1975,[26] there is no attempt to show how much of that business has been lost to Hutton.[27] Furthermore, defendants' calculations reveal that the lost commissions do not exceed .00165 per cent of plaintiff's total commission revenue.[28]

With regard to plaintiff's claims concerning customer misconceptions, plaintiff has not sustained its burden. In the first place, injury, by its nature, is wrongful. Plaintiff has nowhere demonstrated that the idea that customers may be serviced by individual brokers who switch employment is incorrect. In fact, the record at bar contains many indications to the contrary. Furthermore, there has been no competent proof that

defendants have inculcated the notion that individuals *must* continue relationships with their brokers. The language of defendants' letter is not coercive. And, their clients' affidavits attest to the free choice afforded them. Nor has plaintiff demonstrated "great" injury. The most which it can be said to have shown is one disgruntled customer.[29] Furthermore, the potential for such injury, as indicated in the customer letter of Mrs. Schmidt, inheres more in the *manner* of solicitation than in either possession of the information or solicitation per se. Accordingly, the relief sought by plaintiff in this motion would be overly broad as a curative for that specific abuse.

Accordingly, plaintiff's motion must be denied for failure to show irreparable injury.

### (3). *Comparative Injury*

 In the exercise of its equity powers, this Court must weigh the relative injury to the parties. The injury to defendants, when compared with the unsubstantiated harm to plaintiff, poses a legitimate concern. Defendants will be hampered in the pursuit of their business. Plaintiff, on the other hand, is perfectly free to utilize the documents in question in a business capacity. In that vein, it is appropriate to note that plaintiff speaks of maintenance of the status quo. Yet a mandatory injunction of the type plaintiff seeks, has a disruptive impact on the status quo. Also of equitable concern to this Court is the indication that plaintiff engages in similar practices.

### (4). *Public Harm*

 Two competing public interests have been advanced by the parties.

---

26. Brandt Affidavit, ¶ 7.

27. It appears that defendants have not contacted or solicited *all* of their customers.

28. Defendants' figures appear to apply to plaintiff's national standing. However, there

has been no effort by plaintiff to rebut the showing on the basis of local figures.

29. Exhibit 2 to Brandt Affidavit. Letter of Mrs. Schmidt. The remainder of the "proofs" (¶ 17) are hearsay.

Plaintiff urges the Court to emphasize the interest in enforcing fiduciary relationships. Defendants stress the importance of open access to brokerage services, and have identified a specific group, clients, which will suffer from the grant of injunctive relief. It would, in the view of this Court, be particularly unfair to, in effect, deprive the clients who wish to continue to use the services of the individual defendants, of their counsel. Moreover, it would be somewhat incongruous to prohibit defendants from using records to which those very clients are privy. Therefore, the interest in free access to services appears to be overriding.

Accordingly, plaintiff's motion for a preliminary injunction is hereby denied.

It is so ordered.