**PENNWALT CORPORATION, Plaintiff,**

v.

**ZENITH LABORATORIES, INC., Lakeshore Drugs and South-Tel Drugs, Defendants.**

**Civ. A. No. 8–71997.**

United States District Court, E. D. Michigan, S. D.

June 21, 1979.

Herbert G. Sparrow, III, Philip M. Frost, of Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., A. C. F. Finkbiner, III, of Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Timothy D. Wittlinger, of Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., John E. Gould, Webster & Sheffield, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This is an unfair competition and trademark infringement case. Plaintiff, Pennwalt Corporation, manufactures and sells an anorectic drug with the trademark name Ionamin. Defendant, Zenith Laboratories, Inc., manufactures and sells an anorectic drug called Phentermine Hydrochloride.[1] Pennwalt seeks a preliminary injunction prohibiting the continued manufacture, sale, and distribution by Zenith of phentermine products in capsules of confusingly similar size, shape, and color to Ionamin and prohibiting any comparison of Phentermine Hydrochloride to Ionamin. Pennwalt has also moved to dismiss Zenith's counterclaims which allege antitrust violations, interference with business relations, abuse of trademark registration and abuse of process. For reasons stated more fully herein, Pennwalt's motion to preliminarily enjoin Zenith from selling Phentermine Hydrochloride is granted in the forms and to the particular consumers described in this opinion, and Pennwalt's motion to dismiss Zenith's counterclaims is granted.

## PRELIMINARY INJUNCTION

The following findings of fact are based upon testimony and other evidence presented by the parties at the hearing conducted by this court on plaintiff's motion for a preliminary injunction. Ionamin is Pennwalt's registered trademark for a phentermine resin complex available by prescription only. Ionamin is sold in doses of 30 milligrams and 15 milligrams. Thirty milligram capsules are yellow in color and 15 milligram capsules are yellow and grey. The colors of yellow and yellow and grey were consciously selected by Pennwalt for the purpose of giving Ionamin a unique and distinctive appearance from the viewpoint of the patient. Both capsules are approximately ⅝ of an inch in length and 3/16 of an inch in diameter, with rounded ends. These colors, shapes, and sizes have been used continuously from 1958 to the present. The

1. Defendants Lakeshore Drugs and South-Tel Drugs have stipulated to the relief requested from them by plaintiff and are no longer actively involved in this lawsuit.

capsules also bear a small distinctive mark indicating they are a Pennwalt product as well as the National Drug Code Number 18–904.

During the time it has manufactured and sold Ionamin, Pennwalt has made extensive efforts to develop goodwill in its Ionamin products through carefully controlled production, distribution only to wholesale drug dealers and government hospitals, medical journal advertising, direct mail ads to physicians, displays at medical conventions, and a field sales force making face to face presentations to physicians. Much of the advertising and promotion has featured the colors of the Ionamin capsules.

Between 1961 and 1970, Pennwalt has expended between 1 million and 1.5 million dollars on these promotional efforts. Since 1971, the cost of promotion has exceeded two million dollars each year. As a result of these efforts, net sales of Ionamin have grown steadily from 1.5 million dollars in 1963 to 12.5 million dollars in 1976. Net sales dropped in 1977 to 10.8 million dollars and rose again to 12.1 million dollars in 1978.

An investigation of the 1977–78 drop in sales by Pennwalt disclosed the entry of a competitor in the market in 1976, an anorectic drug manufactured by Beecham. This drug is called Fastin and is composed of Phentermine Hydrochloride sold in 30 milligram blue and clear capsules. Pennwalt also discovered, however, that during 1977 and 1978 its decline in net sales of Ionamin was greater than the corresponding decline in prescriptions for Ionamin.

Since 1975, Zenith has manufactured and sold Phentermine Hydrochloride in capsules of the identical dosages, colors, size, and shape as Ionamin. The capsules of Phentermine Hydrochloride do not, however, bear the distinctive Pennwalt mark which appears on the Ionamin capsules and, instead of 18–904, Phentermine Hydrochloride capsules display the National Drug Code Number 172. Zenith also manufactures and sells Phentermine Hydrochloride in blue and clear capsules similar to those manufactured and sold by Beecham. Ze-

nith asserts that it intentionally puts its Phentermine Hydrochloride in capsules with colors corresponding to those used for Ionamin and Fastin so as to preserve any therapeutic effect the patient might derive from the color of the capsule by associating efficacy of the drug with appearance of the capsule.

At some time after it began to manufacture Phentermine Hydrochloride, Zenith published a catalogue of its products in which Phentermine Hydrochloride was listed. The introductory pages of this catalogue include the following statements:

PROFIT . . . . . `by reducing your dollars which are presently tied up in duplicate inventory unnecessarily . . . . . with one complete quality line of Nationally recognized and accepted generic pharmaceuticals . . . . . ZENITH'S.

Recognizing the ever present need to cut your costs while still maintaining a complete line of quality pharmaceuticals has been Zenith's main objective over the past eighteen years. Only recently with the widespread and ever increasing acceptance of quality generics by state and federal agencies has Zenith been recognized as one of the leading national pharmaceutical manufacturers in the country. Let ZENITH help your company towards greater growth with greater profits.

QUALITY, EFFICACY, ELEGANCE plus PROFIT is ZENITH'S formula for success with our customers.

In the body of the catalogue, Zenith's product "Phentermine 30 mg. ** CIV" is listed in a verticle column along with other timed disintegration capsules. In parenthesis underneath the product name appears the description "No. 3 Yellow Capsule." Two other parallel columns on the same page as the column identifying the product "Phentermine 30 mg. ** CIV" describe it as "SIMILAR TO" "Ionamin" and indicate its "CATEGORY OR USE" to be an "Anorexic."

Phentermine Hydrochloride and Ionamin, which is composed of a phentermine resin complex, both contain the same active ingredient, phentermine. "Phentermine" is the generic name for both drugs. However,

all the evidence received by this court indicates that Phentermine Hydrochloride is not the generic equivalent of Ionamin. The only testimony received on this difficult subject was to the effect that a strict definition of generic equivalence is chemical equivalence. Drug products are chemical equivalents according to the United States Food and Drug Administration and the Michigan State Board of Pharmacy if they contain the same active ingredients and are identical in strength, dosage form and route of administration. According to this definition, Phentermine Hydrochloride and Ionamin are not chemical equivalents. A 30 milligram capsule of Ionamin contains 30 milligrams of phentermine whereas a 30 milligram capsule of Phentermine Hydrochloride contains only 24 milligrams of phentermine.

During the hearing it was also brought out that due to the chemical composition of Phentermine Hydrochloride as a highly soluble salt of phentermine all of the active ingredient is released for absorption into the blood stream upon ingestion. Timed release of the active ingredient can be achieved through the use of coatings on the capsule, however, the timing is subject to variation with such factors as the ph level of the patient's gastro-intestinal fluids. Furthermore, the basic mechanism of release, dissolution, remains the same. Unlike Phentermine Hydrochloride, the phentermine resin composing Ionamin is highly insoluble and has no physiological or pharmacological effect until it reacts with cations found in the gastro-intestinal fluids. The rate of drug release from the resin complex depends only upon the total concentration of these cations. Since this concentration is nearly constant throughout the entire gastro-intestinal tract and is insufficient to effect immediate release of all of the active ingredient, predictable, continuous and controlled release of the active ingredient into the blood stream is achieved. These differences in the timing of the release of the active ingredient result in different levels of phentermine in the blood of the patient. Although the medical significance of this variation is unknown, there was uncontradicted testimony to the effect that a physician might consider this difference in drug release mechanisms to be therapeutically significant in the case of a particular patient who had, for instance, a high level of acidity or alkalinity in his or her gastro-intestinal fluids.

The Phentermine Hydrochloride manufactured by Zenith is distributed in bottles which clearly identify the source and nature of the drug. The great bulk of Phentermine Hydrochloride is dispensed by doctors who have the authority to dispense medicine. However, some Phentermine Hydrochloride is dispensed by pharmacists. Jerome Adoree, a pharmacist with ten years of experience, and Dr. Domino, a University of Michigan pharmacology professor, testified that no competent pharmacist could confuse Zenith's Phentermine Hydrochloride with Ionamin given the bottle labels and the unique markings of the capsules themselves. Yet in his affidavit, Paul Mittleman, a registered pharmacist and partner in Lakeshore Drugs, stated that he comingled capsules of Ionamin with capsules of Zenith's Phentermine Hydrochloride when filling a prescription for Ionamin, although he had intended to dispense only Ionamin. Mittleman ascribed this confusion to the identical size, shape, and color of the capsules.

In addition to this incident of confusion as to the identity of the respective drugs, the affidavits of both Mittleman and of Isa Hasan, a registered pharmacist and a partner in South-Tel Drugs, indicate their former belief until the time of this lawsuit that Phentermine Hydrochloride was the generic equivalent of Ionamin based upon representations in drug suppliers' catalogues, one of which contained representations identical to those found in Zenith's catalogue described earlier in this opinion. Based upon this belief, both Mittleman and Hasan substituted Phentermine Hydrochloride for Ionamin when filling a prescription calling for Ionamin. Furthermore, James Adoree, who earlier testified that Phentermine Hydrochloride was not a generic equivalent for Ionamin and could not,

therefore, be substituted for Ionamin by a pharmacist filling a prescription for Ionamin, later testified that his own company did not stock Phentermine Hydrochloride in 15 milligram grey and yellow capsules because there was "not enough product movement on the Ionamin 15 milligrams . . to stock a generic for that particular product." (transcript at 118–19).

■ Plaintiff has asked this court for a preliminary injunction. A party seeking to invoke such relief bears the burden of demonstrating the existence of four elements: (1) a substantial likelihood that the moving party will prevail on the merits; (2) irreparable injury; (3) overriding harm to plaintiff relative to defendant if relief is denied; and (4) the public interest is served by issuance of the injunction. *North Avondale Neighborhood Association et al. v. Cincinnati Metropolitan Housing Authority et al.,* 464 F.2d 486, 488 (6th Cir. 1972); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. E. F. Hutton & Co., Inc.,* 403 F.Supp. 336, 339 (E.D.Mich.1975).

*Success on the Merits*

Plaintiff has alleged that defendant's acts violate the Lanham Act, 15 U.S.C. § 1125(a), in various respects and constitute unfair competition in various respects under Michigan common law. At this juncture only plaintiff's allegation of unfair competition by palming off need be considered.

■ Palming off is one of two theories of Michigan unfair competition law which has remained enforceable after the decisions of the United States Supreme Court in *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corporation v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). *Marion Laboratories, Inc. v. Michigan Pharmacal Corporation,* 338 F.Supp. 762, 766 (E.D.Mich.1972), *aff'd* 473 F.2d 910 (6th Cir. 1973). Although there are no Michigan decisions directly controlling in this case, Michigan courts have generally described unfair competition as consisting:

in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, *or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor.* The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of another, and thereby appropriate to himself the value of the reputation which the other has acquired for his own product or merchandise.

*Schwannecke v. Genesee Coal & Ice Co.,* 262 Mich. 624, 627, 247 N.W. 761, 762 (1933) (emphasis added). It is a variation on the problem of the substitution of the goods of one person for those of another with which this court is concerned.

■ The exact issue before this court is whether Zenith can be held responsible for a pharmacist's palming off of Phentermine Hydrochloride for Ionamin. This court is in agreement with the Eighth Circuit, Seventh Circuit and the United States District Court for the District of Massachusetts that the answer is yes, and that this result is in conformity with the generalized Michigan law on unfair competition. Anyone who puts goods into the hands of dealers for sale to the public, which contain the means for deceiving purchasers, and which that person can reasonably anticipate may be so used, is subject to injunction against the further providing of these means, to eliminate unfair competition against the goods of another which has been or is likely to be engaged in by the dealers. *Stewart Paint Manufacturing Company v. United Hardware Distributing Company,* 253 F.2d 568, 575 (8th Cir. 1958). *See Union Carbide Corporation v. Ever-Ready, Inc.,* 531 F.2d 366, 384 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). More specifically, when a defendant markets a product, that defendant's accountability for his customer's wrongful use of that product turns on the issue of whether a reasonable person in the defendant's position would realize ei-

ther that he himself had created a situation which afforded a temptation or an opportunity to act wrongfully to the average person or was dealing with a customer whom he should know would be peculiarly likely to use the defendant's product wrongfully. *Coca-Cola Co. v. Snow Crest Beverages,* 64 F.Supp. 980, 989 (D.Mass.1946), *aff'd* 162 F.2d 280 (1st Cir.), *cert. denied,* 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). The general prohibition against the substitution of the goods of one person for those of another in *Schwannecke* is certainly broad enough to encompass one who induces such a substitution under the conditions stated in *Snow Crest* as well as one who effects the actual substitution. To hold otherwise would be to mock the rule announced in *Schwannecke.*

■ Although Michigan courts have spoken only generally on the subject of unfair competition, Michigan statutory law has directly addressed the problem presented in this case. The Public Health Code of Michigan, M.C.L.A. 333.1101 *et seq.,* provides that under certain conditions a pharmacist may substitute only a generically equivalent drug product for a prescribed brand name drug product. M.C.L.A. 333.17755(1). The Act also specifies that in the event substitution does occur the purchaser shall be notified. M.C.L.A. 333.17755(1). It is important to note that the act of substituting one drug for another drug which is not generically equivalent, even if the substitution is not deceptive, is forbidden by the law of Michigan. The act of substituting one manufacturer's product for the generically equivalent product of another manufacturer is, conversely, clearly contemplated by the legislature in order to fulfill the public policy favoring substitution of generically equivalent drugs embodied in M.C.L.A. 333.17755(1). Notice of such substitution is still required, however, to prevent deception. M.C.L.A. 333.17757(2). This court relies upon these statutory provisions for its decision concerning plaintiff's claim of unfair competition.

■ While there has been no evidence presented in this case that Zenith has itself palmed off Phentermine Hydrochloride for Ionamin there has been substantial evidence of the existence of circumstances which, taken together, invite the deceptive substitution of Phentermine Hydrochloride for Ionamin. One such circumstance is the Public Health Code which does not explicitly define the term "generically equivalent" even though it does prohibit the substitution of one drug for another which is not a generic equivalent.[2] The resultant ambiguity in the law reposes an enormous amount of discretion in the pharmacist and, in effect, relieves the pharmacist of clear legal liability for all but the grossest sorts of improprieties in substitution. Given these guidelines an honest pharmacist can understandably be confused while a less scrupulous pharmacist has a ready made excuse for engaging in a wide range of inappropriate substitutions.

This situation is exacerbated by the representations contained in the catalogue which was once published by Zenith. Although the introductory remarks in that catalogue refer to the use of "accepted generic pharmaceuticals" manufactured by Zenith, no Zenith products in the catalogue were compared with competing brand name drugs using the term generic. All Zenith products were described as "Similar To" competing brand name drugs. The reader is left to make the obvious inference that drugs which are similar to each other must be generic pharmaceuticals. As described earlier in this opinion, there is a distinction

---

**2.** One of the circumstances under which a generically equivalent drug may not be dispensed is stated to be when: "The prescriber, having preprinted on his or her prescription blanks the statement 'another brand of a generically equivalent product, identical in dosage, form, and content of active ingredients, may be dispensed unless initialed d. a. w.,' writes in his or her own handwriting, the initials 'd. a. w.' in a space, box, or square adjacent to the statement." Taken in context, this statement strongly suggests a definition of generically equivalent almost identical to that used by the United States Food and Drug Administration and the Michigan State Board of Pharmacy. However, the statement does not appear in the Code in a form which unequivocally binds dispensing pharmacists.

between the terms generic and generic equivalent which becomes significant when comparing a phentermine resin such as Ionamin with Phentermine Hydrochloride. Phentermine is the generic name for both drugs, but the two are not generically equivalent. Add to this already confusing terminology the undefined term "generic pharmaceuticals" and there can be little doubt but that the law in Michigan provides less deterrent influence than intended against pharmacists who are motivated to substitute Phentermine Hydrochloride for Ionamin.

The motivation for substitution can be found in the price difference between Ionamin and the less expensive Phentermine Hydrochloride. Under Michigan law this difference represents a savings to the purchaser of drugs which must be passed on by the pharmacist. M.C.L.A. 338.1114a(2). The price difference also represents an added profit margin for the pharmacist who deceptively substitutes Phentermine Hydrochloride for Ionamin. The introductory remarks to the Zenith catalogue enthusiastically point out that "ZENITH [can] help your company towards greater growth with greater profits."

The supporting keystone which transforms these circumstances into an edifice for deception, and which is in the complete control of Zenith, is the appearance of the Phentermine Hydrochloride capsule. With the exception of Pennwalt's distinctive mark and the National Drug Code number appearing on the capsule, both of which were so small that defendant's own expert pharmacologist could not read them while on the stand, capsules of Phentermine Hydrochloride are exactly identical to capsules of Ionamin in appearance. Zenith not only manufactures the capsules in this fashion but at one time in the past four years advertised that fact in its catalogue by stating the color of the capsule under the name of the drug. It is the appearance of Phentermine Hydrochloride which enables pharmacists to deceive unwary purchasers into believing they have in fact purchased Ionamin for the price of Ionamin. If, as a practical matter, substitutions cannot be de-

tected it is a short step from passing the savings on to the consumer to passing the savings on to oneself.

To substantiate this conclusion, this court has heard ample evidence that pharmacists correlate Phentermine Hydrochloride with Ionamin and indeed have substituted Zenith's Phentermine Hydrochloride for Pennwalt's Ionamin. The testimony of James Adoree strongly suggests his association of Phentermine Hydrochloride as a drug which could be substituted for Ionamin. In their affidavits both Paul Mittleman and Isa Hasan admit to having deceptively substituted Phentermine Hydrochloride for Ionamin when filling prescriptions calling for Ionamin. Furthermore, Pennwalt's finding that the decline in sales of Ionamin was greater than the corresponding decline in prescriptions for Ionamin in 1977, together with the aforementioned circumstances, strongly suggests that the deceptive substitution of Phentermine Hydrochloride for Ionamin is more widespread than the acts of Mittleman and Hasan.

As stated in *Snow Crest,* the defendant's accountability for its customers' wrongful use of its product turns on the issue of whether a reasonable person in the defendant's position would realize either that he or she had created a situation which afforded a temptation or an opportunity to act wrongfully to the average person or was dealing with a customer whom he or she should know would be peculiarly likely to use the defendant's product wrongfully. It is this court's conclusion that Zenith not only should have been aware of these circumstances as a reasonable manufacturer but that, by distributing Phentermine Hydrochloride in a capsule so similar in appearance to Ionamin, Zenith was putting a drug into the hands of pharmacists for sale to the public which it intended to be deceptively substituted for another drug for which it was not a generic equivalent.

Zenith had numerous colors, sizes, and shapes from which to choose when designing its Phentermine Hydrochloride yet it chose the exact color, size, and shape of

Pennwalt's Ionamin. There was evidence submitted by defendant to suggest that the appearance of the capsule containing Phentermine Hydrochloride has therapeutic value in that patients previously receiving Ionamin associate efficaciousness of an anorexic with the color, size, and shape of Ionamin. This court makes no finding at this time on the issue of whether capsule color has a therapeutic value. However, use of the color, size, and shape of Ionamin in the manufacture of Phentermine Hydrochloride for reasons of therapeutic value does not prevent Zenith from taking some other precaution to prevent the passing off of its product for Pennwalt's. Rather than take such a precaution, however, Zenith at one time published a catalogue in which various representations were made which could not help but encourage the substitution of Phentermine Hydrochloride for Ionamin. Furthermore, there was no evidence presented to this court on any action Zenith had taken to counteract any mistaken or inappropriate impressions that the catalogue or the appearance of its product might have created in the minds of pharmacists. Pennwalt has established a likelihood of success on the merits of its claim of unfair competition.

*Irreparable Harm*

■ The concept of irreparable injury is based upon the inadequacy of compensatory damages. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E. F. Hutton & Co., Inc.*, 403 F.Supp. 336, 343 (E.D.Mich.1975). In this case Pennwalt has shown that it has suffered a loss of control over its reputation and thus its goodwill by virtue of having no control over the quality of Zenith's product being passed off as Ionamin. Even if Zenith could match the quality of Ionamin in terms of chemical purity or other factors it is clear from the evidence adduced that in certain functional respects Phentermine Hydrochloride is not the same as Ionamin and that this difference could conceivably be manifest in different patients. These are intangible injuries for which compensatory damages are totally inadequate and which, therefore, qualify as irreparable injuries. *Franklin Mint, Inc. v. Franklin Mint, Ltd.*, 331 F.Supp. 827, 830 (E.D.Pa. 1971).

*Balance of Harm*

■ In contrast to the injury suffered by Pennwalt, Zenith asserts that an order enjoining it from manufacturing, selling, and distributing Phentermine Hydrochloride in the colors, shapes, and sizes complained of by Pennwalt will inflict severe financial hardship on Zenith, thereby seriously impairing Zenith's ability to compete with other larger drug manufacturers such as Pennwalt. Therefore, in balancing the harm to Pennwalt if an injunction is not granted against the harm to Zenith if an injunction is granted, this court must in effect balance the interest in free competition against the interest in securing to businesses the fruits of their initiative and enterprise. In *Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 455 F.Supp. 939 (E.D.N.Y.1978), the court resolved this balancing process in favor of the interest in free competition by declining to grant an injunction which would in effect have granted the plaintiff drug manufacturer a virtual monopoly over the use of the colors red and blue in connection with the drug cyclandelate. The plaintiff, Ives, had sought such an injunction to protect its drug with the registered trademark "Cyclospasmol" against the effects of illegal substitution by pharmacists of defendant, Darby's, drug "cyclandelate." The court reasoned that the Supreme Court decisions in *Sears* and *Compco* established a strong federal policy favoring free competition as opposed to protection of initiative and that the injunction requested by plaintiff would significantly abridge legitimate competition in the state of New York while having only a minimal deterrent effect on pharmacists making substitutions that were indisputably illegal under New York law. The court also expressed its opinion that New York's policy of permitting substitutions of appropriate drugs would be impaired by giving the plaintiff in that case the exclusive use of

red and blue in connection with its drug Cyclospasmol.[3]

Although the court in *Ives* clearly articulated the interests to be balanced in unfair competition cases, the facts of this case require the balance to be struck differently.

The court in *Ives* gave no consideration whatsoever to the issue of whether the two drug products in question were generically equivalent. Under Michigan law this is a critical consideration. Rather than inhibiting otherwise appropriate substitution as was the case in New York, an injunction in this case would lend support to Michigan law by eliminating a method of substituting drugs without detection which are not generically equivalent. Furthermore, unlike New York, the law in Michigan concerning substitution of drugs is acknowledged to be unclear by all the witnesses who testified in this case. Given this confusion the state law does not provide as effective a deterrent to improper substitution by pharmacists as does the New York law in the *Ives* case. Thus, an injunction prohibiting Zenith from using the colors yellow and grey for its capsules of Phentermine Hydrochloride will have a much greater deterrent effect on unscrupulous or confused pharmacists than would a similar injunction in the *Ives* case.

The effect of an injunction achieving the desired deterrent effect on pharmacists also need not seriously damage Zenith's ability to compete legitimately with other drug manufacturers. Zenith currently manufactures, sells, and dispenses Phentermine Hydrochloride in a blue and clear capsule form which Pennwalt does not seek to enjoin. Furthermore, since Zenith transacts the bulk of its business directly with dispensing physicians, an injunction prohibiting Zenith from distributing its yellow and grey capsules of Phentermine Hydrochloride to pharmacists only would serve to prevent pharmacists from making improper substitutions while preserving Zenith's competitive posture in yellow and yellow and grey

capsules through the offices of the dispensing physician. In this fashion the anticompetitive effect of an injunction may be minimized with the result that the balance of the harms favors the plaintiff in this case.

Plaintiff, however, has requested that this court issue a preliminary injunction which would prohibit the distribution and sale of capsules of Phentermine Hydrochloride which are confusingly similar to capsules of Ionamin to anyone, including the dispensing physician. Based on the evidence plaintiff has adduced in this court and the brief it has submitted, it is this court's understanding that the purpose of the injunction sought by plaintiff is to prevent the deceptive substitution of Phentermine Hydrochloride for Ionamin. Plaintiff disclaims any intention to avoid honest and open competition with defendant. Yet the dispensing physician, who would be affected by the order requested by plaintiff, in the facts of this case neither substitutes one drug for another nor is deceived by the similar appearances of Phentermine Hydrochloride and Ionamin.

Instead of substituting one drug for another, the dispensing physician is in fact the individual who truly exercises the consumer-patient's freedom of choice in the marketplace when issuing a prescription. The physician may legitimately take into consideration not only the properties of the drug being prescribed but the patient's ability to pay. Either of these two considerations might lead a dispensing physician to choose to prescribe Phentermine Hydrochloride for his or her patient rather than Ionamin. Furthermore, dispensing physicians are trained in pharmacology and can be presumed to know the differences between Ionamin and Phentermine Hydrochloride described earlier in this opinion. Thus the dispensing physician is not deceived by the similar colors of Phentermine Hydrochloride and Ionamin.

To prohibit the distribution or sale of Phentermine Hydrochloride to dispensing

---

**3.** Section 6810(6) of the New York Education Law at the time of the *Ives* opinion required the prescription form to state conspicuously: "This

prescription will be filled generically unless physician signs a line stating 'dispense as written.' "

physicians would not only inhibit the ability of Zenith to compete in the marketplace but it would place undue restrictions on a dispenser of medicine who does not engage in the practice of substitution as that term is used in the law of unfair competition. This court refuses to issue an order which would produce such a result.

*Public Interest*

 The evidence in this case and the law of the State of Michigan leaves no doubt that the State of Michigan finds the substitution of generically equivalent drugs for brand name drugs to be in the public interest. This policy, which protects the financial interests of patients in an industry fraught with notoriously high and rapidly rising costs and which promotes competition, itself deserves to be protected. While the substitution of Phentermine Hydrochloride for Ionamin ostensibly fulfills this policy, such a substitution actually undermines this policy and betrays the public interest by virtue of the fact that Phentermine Hydrochloride is not the generic equivalent of Ionamin. Even if a patient experienced a therapeutic sense of confidence from a Phentermine Hydrochloride capsule with the size, shape, and color of an Ionamin capsule, it would not be entirely justifiable insofar as there is no corresponding factual basis upon which to conclude that Phentermine Hydrochloride will produce the same results in all instances as will Ionamin. Any public interest in such a therapeutic effect is outweighed by the public interest in the integrity of the guidelines which do exist for the substitution of prescription drugs.

 Plaintiff has proven a likelihood of success on the merits of its unfair competition claim, the existence of irreparable injury, the overriding nature of the harm to it relative to defendant if an injunction should not issue, and the benefit to the public interest from the issuance of an injunction. For these reasons defendant, Zenith, and its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who

receive actual notice of this order by personal service or otherwise are hereby enjoined from the sale or distribution to pharmacists of Phentermine Hydrochloride in capsules of confusingly similar color to plaintiff's Ionamin.

MOTION TO DISMISS

Pennwalt has moved to dismiss Zenith's counterclaims against Pennwalt alleging (1) an attempt to monopolize which is prohibited by § 2 of the Sherman Antitrust Act, (2) interference with Zenith's business relationships, (3) abuse of trademark registration, and (4) abuse of process for failure to state a claim upon which relief can be granted. The central concept of these counterclaims is Zenith's allegation that by threatening lawsuits and bringing lawsuits against retailers who deal with Zenith and sell Zenith products, Pennwalt is attempting to monopolize the market for phentermine products, thereby impermissibly interfering with Zenith's business relationships with others, abusing the fact that it has registered the trademark "Ionamin," and abusing the process of this court.

 In its antitrust counterclaim, Zenith has failed to allege an essential element of an "attempt to monopolize" claim under § 2 of the Sherman Act. Numerous cases have indicated that in order to state a cause of action under this section, one must not only allege that the charged party has attempted to monopolize a certain market but also that the charged party holds such power in the market that there is a "dangerous probability" that the attempt will succeed. *Zenith Vinyl Fabrics Corp. v. Ford Motor Company,* 357 F.Supp. 133 (E.D. Mich.1973), *aff'd* Civ.No. 73–1537 (6th Cir. June 5, 1974), *cert. denied* 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974); *Swift and Company v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019 (2d Cir. 1976), *cert. denied* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). Nothing in the counterclaim alleges any market power whatsoever, and, therefore, no allegation of a dangerous probability of

success in the attempt to monopolize is presented. For this reason alone, the antitrust claim must be dismissed.

■ However, there is another argument that necessitates dismissal not only of the antitrust claim, but of the others as well. Pennwalt correctly points out that it has a constitutional right to seek redress from wrong in the courts. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.*, 560 F.2d 211 (6th Cir. 1977). This right has its genesis in the First Amendment to the United States Constitution and may be considered part of what has become known as the *Noerr-Pennington* doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The right to seek redress through civil suit must be given the same protection as the right to attempt to induce a legislative or administrative body to take some lawful action.

Under this theory, Pennwalt may not be subjected to liability for its attempt to have its rights protected by the courts unless that attempt is shown to have been a mere "sham." *Noerr, supra*; *California Transport, supra*.

It appears to be the claim of Zenith that since lawsuits or threats of lawsuits against retail customers of Zenith may have some chilling effect on Zenith's business, such lawsuits or threats of lawsuits are not protected by the *Noerr-Pennington* doctrine. There has been nothing to suggest that Pennwalt did not have valid claims against the retailers who have been joined in this lawsuit. In fact, each of the retailer defendants has already entered into a consent judgment with Pennwalt which admits that it has in the past substituted Phentermine Hydrochloride for Ionamin and which precludes it from making such substitutions in the future.

This is not what is meant by a sham. The sham exception exists to prevent the filing of groundless lawsuits which are begun only to harass and injure the defendants. This is not such a situation.

For both of the reasons set out above, the antitrust counterclaim is dismissed.

While the failure to allege sufficient market power is relevant only to the antitrust claim, the First Amendment right to petition affects all of Zenith's claims. The factual allegations are the same in each of the claims, and, as discussed above, there is nothing in those allegations that goes beyond threatening to file and filing lawsuits that appear to be based on probable cause. While the *Noerr-Pennington* doctrine evolved from antitrust claims, the First Amendment rights that it protects are equally applicable to each of the other claims made by Zenith. As in antitrust cases, these are not absolute rights, but as discussed, nothing in the allegations made by Zenith would bring any of these claims within the "sham" exception to these First Amendment rights. For this reason, all of the remaining counterclaims are dismissed.

In summary, plaintiff has satisfied its burden of proof in each of the areas considered by a court in determining whether to grant a preliminary injunction. For this reason the defendant is enjoined from the sale or distribution to pharmacists of Phentermine Hydrochloride in capsules of confusingly similar color to plaintiff's Ionamin. In addition, defendant's failure to allege a dangerous probability of success in its antitrust claim as well as the First Amendment right to seek redress for wrongdoing in court asserted by plaintiff requires the dismissal of defendant's counterclaims pursuant to plaintiff's motion to dismiss.

So ordered.