BOEHRINGER INGELHEIM G.m.b.H.,
et al., Plaintiffs,

v.

PHARMADYNE LABORATORIES, et
al., Defendants.

BOEHRINGER INGELHEIM G.m.b.H.,
et al., Plaintiffs,

v.

PREMO PHARMACEUTICAL LABORA-
TORIES, et al., Defendants.

Civ. No. 79–738.

United States District Court,
D. New Jersey.

Sept. 24, 1980.

Morgan, Finnegan, Pine, Foley & Lee, New York City, Kuttner & Toner, Livingston, N. J., for plaintiffs.

Kirschstein, Kirschstein, Ottinger & Cobrin, P. C., New York City, Podvey & Sachs, P. C., Newark, N. J., Ostrolenk, Faber, Gerb & Soffen, New York City, for defendants.

## MEMORANDUM OPINION

LACEY, District Judge.

THE COURT: In these consolidated actions plaintiffs charged the defendants with patent infringement and unfair competition. The patent issues were resolved by a consent judgment entered against the defendants. Plaintiffs' claims that defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the New Jersey law of unfair competition, were tried before the court without a jury. The following constitutes my findings of fact and conclusions of law. Fed.R.Civ.P. 52.

### THE PARTIES

*The Plaintiffs*

The plaintiffs in both actions are Boehringer G.m.b.H., a West German corporation, and its affiliate, Boehringer Ingelheim Ltd. (Boehringer Ltd.), a Delaware corporation, having a principal place of business in Ridgefield, Connecticut. They will be collectively referred to as "Boehringer."

*The Defendants*

In Civil No. 79–358, Pharmadyne Laboratories, Inc. (Pharmadyne), is a New Jersey corporation with its principal place of business at East Brunswick, New Jersey. Bernard Bedrick (Bedrick) at all pertinent times has been president of Pharmadyne. Pharmadyne and Bedrick will be referred to collectively as "Pharmadyne."

In Civil No. 79–938, Premo Pharmaceutical Laboratories, Inc. (Premo), is a New York corporation having its principal place of business in South Hackensack, New Jersey. Seymour Blackman (Blackman) at all pertinent times has been president and chief executive officer of Premo. Premo and Blackman will be referred to collectively as "Premo."

## PROCEDURAL HISTORY

On January 31, 1979, plaintiffs filed a three-count complaint against defendant Pharmadyne. In the first count plaintiffs alleged Pharmadyne had infringed their patent. Plaintiffs also alleged that Pharmadyne had committed unfair competition under both the Lanham Act and New Jersey state law by deliberately marketing their dipyridamole tablets with the same arbitrary and distinctive trade dress as plaintiffs' Persantine-brand dipyridamole. Plaintiffs alleged that their distinctive trade dress had acquired secondary meaning; that Pharmadyne was creating confusion of origin by simulating plaintiffs' trade dress; and that such conduct was facilitating the passing off by pharmacists of Pharmadyne's products for plaintiffs'. The plaintiffs sought injunctive relief, damages,[1] and costs. On February 23, 1979, a consent judgment was entered against Pharmadyne on Count 1. Under the terms of that judgment, Pharmadyne was enjoined from selling its generic dipyridamole until the patent expired on April 24, 1979.

In March 1979, plaintiffs brought suit against defendant Premo. The complaint made the same allegations as against Pharmadyne and requested the same relief. On March 9, 1979, plaintiffs' application for a temporary restraining order was heard by one of the other judges in the district. He granted the application. Six days later I heard oral argument on the question of whether a preliminary injunction should issue on plaintiffs' unfair competition claims

and denied plaintiffs' application for a preliminary injunction on Counts 2 and 3.[2]

My denial of injunctive relief rested on the inadequate factual foundation laid by plaintiffs. For example, plaintiffs contended that they had demonstrated secondary meaning. I found "that on the basis of the present record secondary meaning has not been shown." Opinion of March 15, 1979, at 8. I also noted that the plaintiffs had not shown "that the color of their tablet is distinctive." Id. at 9. Evidence of passing off was missing. Id. at 11.

The case can now be decided on a complete record, with all parties having had ample opportunity to adduce evidence addressing the factual issues underscored by my earlier opinion.

On May 8, 1979, Premo filed a motion for summary judgment on Counts 2 and 3. In an opinion filed on June 19, 1979, I denied the motion, without prejudice to renewal, to give the plaintiffs an opportunity to produce evidence of secondary meaning and passing off. Subsequently, contending that plaintiffs had failed to offer the necessary evidence, Premo again moved for summary judgment. Oral argument took place on the motion on October 9, 1979. At the conclusion of oral argument, I denied Premo's motion, holding that plaintiffs had shown that genuine issues of material fact existed.

In November 1979, plaintiffs amended their complaint against Pharmadyne by adding a fourth count. This additional count alleged that Pharmadyne had violated the Lanham Act through inaccurate statements made in advertisements for its dipyridamole. Shortly thereafter, Pharmadyne sought to file an amended answer which included a counterclaim that plaintiffs had broken the antitrust laws. Neither plaintiffs' fourth claim against Pharmadyne nor Pharmadyne's counterclaim are now before this court.

---

1. By stipulation plaintiffs have waived damages from May 21, 1979, to the end of the trial.

2. Premo consented to a preliminary injunction on Count 1 restraining it from making, using, or selling dipyridamole in the United States until the expiration of plaintiffs' patent.

On February 19, 1980, Pharmadyne withdrew its antitrust counterclaim. Thereafter, I consolidated the Premo and Pharmadyne cases; at the same time I severed Count 4 of plaintiffs' complaint against Pharmadyne. Thus, the only claims tried were plaintiffs' claims that defendants had violated the Lanham Act and New Jersey law by copying the Persantine trade dress.[3]

This court has jurisdiction over plaintiffs' claims under 43(a) of the Lanham Act, under 28 U.S.C. §§ 1331, 1332 and 1338(b). The court also has jurisdiction over the New Jersey statutory and common law claims through explicit grants of federal jurisdiction, 28 U.S.C. §§ 1332 and 1338, and on the basis of pendent jurisdiction.

## I

Dipyridamole, a prescription drug, is a coronary vasodilator used by physicians in the long-term treatment of angina pectoris. Dipyridamole treatment usually takes many months, and almost invariably necessitates repeat or refill prescriptions.

Dipyridamole is the generic name of this medication. Boehringer, which for many years has engaged in the sale and preparation of pharmaceutical products, has given its brand of dipyridamole the trade name Persantine. In 1966 Persantine became a federally registered trademark.

From 1962 until about 1971, Geigy, Inc. (now Ciba-Geigy Corp.), marketed Persantine brand dipyridamole[4] in the United States pursuant to a license agreement with Boehringer G.m.b.H. Since about 1973, Boehringer Ltd. has marketed Persantine brand dipyridamole in the United States under a patent and trademark license from Boehringer G.m.b.H. All Persantine brand dipyridamole marketed in the United States has been manufactured by Geigy under the control and by the authority of one or both of the plaintiffs.

Persantine has been a commercial success. One reason for the profitability of Persantine has been that it enjoys the reputation with the medical profession of being a highly useful and safe medication. This reputation is in part based upon the substantial sums of money invested in research and development, clinical testing and quality control with respect to Persantine and other pharmaceutical products.[5] In the case of Persantine, plaintiffs have maintained their reputation for quality by imposing strict standards for Geigy's manufacture of Persantine. Plaintiffs periodically conduct tests to assure themselves that Geigy is conforming to all manufacturing specifications, including color of tablets. The testing and extensive promotion of Persantine and the satisfactory results obtained from it all play a significant role in the decisions of physicians to prescribe Persantine.[6]

Since October 1978, both Premo and Pharmadyne have been marketing dipyridamole tablets in the state of New Jersey and in interstate commerce. Both of these companies market generic pharmaceutical products that duplicate the trade dress of successful brand name drugs on which patents have expired.[7]

---

3. Both defendants raised numerous affirmative defenses in their answers. The only affirmative defense presenting an issue not raised by plaintiffs' allegations is Pharmadyne's contention that Persantine has become the generic name for dipyridamole. This affirmative defense is discussed below.

4. At one point Persantine was sold under the name of Persantin.

5. By way of contrast, defendants, as generic drug companies, market "generic pharmaceutical products that are duplicative of drugs developed and manufactured by research-oriented companies ...." *Eli Lilly and Company v.*

*Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120 at 122 (3d Cir., 1980) (Adams, J.). Judge Adams added: "Because Premo has only a small research and development budget, it is generally able to sell its products at prices lower than those offered by competitors that engage in more extensive research and development." Id. The same is true of Persantine.

6. The advertising and promotion of Persantine is dealt with below. *See* 1056, *infra*.

7. It appears that companies other than the defendants are selling dipyridamole 25 mg. tablets identical to plaintiffs' Persantine and that suit has not been brought against them. This

All parties market their dipyridamole tablets in doses of 25 mg. Plaintiffs have stipulated that the dipyridamole manufactured by defendants is the chemical and therapeutic equivalent of Persantine. Plaintiffs contend, however, that the dissolution rates of the products differ, and they further contend that some significance attaches to the variations in rates. I reject this argument. Variation in dissolution rates, unless linked to some chemical, biological, or physical trait that affects the performance or operation of the drug, is of theoretical interest only. It has no bearing on the resolution of this case.

It is noted, however, that the New Jersey Drug Utilization Council has refused to place defendants' dipyridamole on the New Jersey Formulary of generic drugs approved for substitution, citing "potential bioequivalence problems." Thus, under New Jersey's drug substitution law, N.J. S.A. 24:6E–1 et seq., defendants' products cannot legally be substituted for plaintiffs' Persantine. Cf. N.J.S.A. 24:6E–8.

Dipyridamole itself is a yellow powder. Plaintiffs chose to sell Persantine in the United States in small orange biconvex tablets. This decision was not inevitable; any color could have been used. Indeed, plaintiffs sell a different colored Persantine in Germany; and defendants concede that no technological obstacle exists to selling dipyridamole in a color other than orange. Nonetheless, defendants also sell their dipyridamole in orange biconvex tablets. That defendants, the late-comers to the market, use the same color—and size and shape—tablet as plaintiffs' is not happenstance. Both defendants admit that they intentionally copied the size, shape, color and overall appearance of plaintiffs' Persantine brand

dipyridamole. See Blackman deposition, Tr. 40. Pharmadyne has made a similar concession of intentional copying.[8]

Virtually identical to plaintiffs' tablet in size, shape, and color, defendants' tablets do differ in one respect: the logo. Persantine brand dipyridamole tablets bear the logo "BI" on one side and the number "17" in small print on the other side. "BI," of course, stands for Boehringer Ingelheim. The number "17" aids professional people having access to reference books in identifying the specific product. Tr. 46. Pharmadyne's dipyridamole has a black "P" printed on the capsule; Premo, which had no logo at all until April 1980, now utilizes a double "P."

These logos, however, cannot be regarded as a realistic means of allowing patients to identify the source of their dipyridamole. A side-by-side comparison of defendants' dipyridamole products with Persantine reveals their tablets to be identical, for all practical purposes, to plaintiffs'. The logos appear in such fine print that few patients will detect the difference.

Premo offered its logo as a distinguishing factor in SK&F v. Premo, 625 F.2d 1055 at 1061 (3d Cir., 1980). Judge Gibbons, writing for a unanimous court, rejected that contention:

The district court, examining the capsules, specifically found that the logos were so small that they would be ineffective to prevent confusion as to source or passing off. We have also examined them, and conclude that the district court's finding is not clearly erroneous. Indeed, an opposite conclusion well might be, for to our over-fifty eyes the logos are decipherable only with great difficulty.[9]

does not lessen the responsibility of the defendants not to engage in unfair competition against plaintiffs. A. H. Robins v. Medicine Chest Corp., No. 77–1298–C(C) (E.D.Mo. May 12, 1980), slip op. at 11.

8. Pharmadyne's position is slightly different from that of Premo's. In its Critique of Plaintiffs' Proposed Findings of Fact 13, Pharmadyne states that originally its product "was somewhat different in size and color and the

marketplace forced the company to market a closer look-alike." Pharmadyne has never clarified this statement, although its obvious intent is to deflect the force of plaintiffs' accusation of intentional copying. I must reject this proffered justification.

9. SK&F v. Premo will be cited throughout this opinion, although it is recognized that the Court of Appeals was reviewing a much more limited record than is present here, and also

This observation holds particular relevance to the facts of this case for, as defendants have stressed throughout this litigation, many of the users of Persantine are elderly. Only those with acute vision are likely to detect differences in logo, and a substantial number of Persantine users will not have sufficiently sharp eyesight.

The conclusion that the logos inadequately serve the goal of identifying for the patient the manufacturer of the dipyridamole, and alerting the patient to a change in product, is buttressed by the arguments tendered by defendants for allowing them to sell their dipyridamole in tablets similar to Persantine in appearance. In particular, defendants have vigorously insisted since the institution of this litigation that it is important for generic drugs to look like name brand drugs so as not to cause patient "anxiety." Yet this argument—one of defendants' principal justifications for the sale of look-alike medications—irreconcilably conflicts with a contention that logos enable patients to learn of the source of their medication. *Cf. Hoffmann LaRoche, Inc. v. Premo Pharmaceutical Laboratories, Inc.,* Civ. 77–1001 (D.N.J. September 3, 1980), slip op., 20.

It is clear that defendants intentionally designed their dipyridamole tablets to be confusingly similar to those sold by plaintiffs. Before turning to defendants' list of claimed reasons for this copying, it may be helpful first, in placing some of the issues in context, to discuss the law of generic substitution as dealt with at trial. *Cf., Hoffmann LaRoche, Inc. v. Premo Pharmaceutical Laboratories, Inc., supra,* slip op., 10.

In the early 1970s, some states repealed drug antisubstitution statutes and enacted generic drug substitution laws. The idea behind the new laws was to provide lower cost prescription drugs to consumers. Forty-six states have now enacted generic drug substitution statutes. Varying in many particulars, the statutes generally allow a pharmacist to fill a physician's prescription for a brand name product with a bioequivalent product of another manufacturer. In some states substitution laws may, under certain circumstances, compel such substitution.

Usually, the process of substitution begins with the physician. The doctor may prescribe a brand name product but indicate, in the appropriate place on the prescription form, "substitution permitted" or "do not substitute" or other, comparable language. *See* N.J.S.A. 24:6E–1 *et seq.*

Assuming the filling were to take place in New Jersey, the pharmacist would then review the prescription when presented by the patient. If substitution is permitted by the physician, the pharmacist goes to the New Jersey State Formulary List and can substitute a generic there listed and matched with the brand name product. Most states are like New Jersey, in that substitutions can be made by the pharmacist only if the physician has indicated on the prescription form that substitution may take place. Not all, however, have the additional formulary requirement.

In many states, the patient has the right to decide if he or she wants a generic drug. Thus, the pharmacist may say, "Your physician is permitting substitution. Do you want a generic drug instead of the name brand drug?" [10] Sometimes, however, when the prescription is filled through a third-party payment plan, the patient may not have a choice.

## II

Defendants offer a variety of explanations for why their dipyridamole must have the same appearance as that of plaintiffs' Persantine. The three main reasons are: (1) to avoid causing anxiety in a patient

was acting under a circumscribed standard of review on the appeal from the grant of a preliminary injunction by the district court. Nonetheless, many of the same legal and factual issues presented here were also before the Court of Appeals in that case and many of the arguments advanced by Premo before this court were submitted to the Court of Appeals by Premo in *SK&F.*

**10.** *See SK&F v. Premo, supra,* 1062; N.J.S.A. 24:6E–7–10.

who is "switched" from Persantine to defendants' products; (2) to enable patients on several medications to identify each by a color, e.g., orange, green, and blue pills; and (3) to enable identification of a drug to be made in an emergency situation, i.e., here by the size, color and shape of the defendants' products. Cf. SK&F v. Premo, supra; Hoffmann LaRoche, Inc. v. Premo Pharmaceutical Laboratories, Inc., supra (the same reasons were there tendered by Premo).

Defendants have stated that if they "had not marketed their dipyridamole product in a form identical in appearance to persantine brand dipyridamole, defendants would have been marketing an inferior product in that a non-look alike generic dipyridamole would have resulted in patient anxiety thus lessening the therapeutic effects of the pharmaceutical." Premo's Critique to Plaintiffs' Proposed Finding of Fact 13 ("Critique").

Defendants' "anxiety" argument rests on several premises. First, defendants must assume that patients will not know that they have been "switched" from a brand drug to a generic. Copying the appearance of the brand drug so that patients do not know of the new source of their medication serves no purpose if patients learn of the change in some other way. Second, defendants must also believe that a patient's learning of a change in drug manufacturer actually generates "anxiety." Neither premise can withstand scrutiny. In SK&F, Premo made the same "anxiety" argument. Arguing before the Third Circuit that the district court injunction should be lifted, Premo relied on an affidavit by Dr. Nathaniel Shafer:

> 'In my opinion, many patients who have been using Dyazide on an extended basis would become uneasy, confused and react adversely if they received a renewal of their prescriptions with a different colored or shaped medication, even though the medication is completely identical. This could hamper the therapeutic effectiveness of the generic medication.'

SK&F at 1061. Judge Gibbons deftly punctured this analysis:

> The Shafer affidavit makes no reference, however, to the requirement in the law of most states which permit generic substitution that the purchaser be notified of the substitution. Assuming compliance with those laws it is difficult to credit the assertion that a difference in color would increase the patient's anxiety, because the patient will be informed of the substitution and will usually have the right to refuse to accept the generic.[11]

Id.

Thus, the very generic substitution laws which defendants rely upon mandate that the patient learn of the substitution. See N.J.S.A. 24:6E–7–10.

Moreover, the evidence in the record in this case shows that patients will ordinarily be told that they will be or are receiving a generic drug. Medical experts from both sides testified that when they permit substitution they will alert the patient of the change; at the same time they will inform the patient of the appearance of the generic. During this discussion the doctor will tell the patient that a non-look-alike generic is the same medication as before and that substitution is being permitted to save the patient money. It further appears that, even if the physician does not advise the patient of the switch, the pharmacist ordinarily will do so. As has been noted, the pharmacist should advise the patient of the proposed substitution, so that the patient can decide whether he or she wants a generic drug. Thus, regardless of whether the generic is identical in appearance to the brand name, the patient ought to be—and usually is—told that a generic medication is now being dispensed.

Moreover, if neither the physician nor pharmacist alerts the patient to the substitution of a look-alike, another factor, in most cases, will lead a patient to become aware of the substitution. The generic drug industry has grown precisely because

---

11. Dr. Shafer submitted in this proceeding an affidavit making the identical claim in the identical words as he did in SK&F; only the name of the medication has been changed.

generics generally cost the patient much less money. Thus, in the normal circumstance, *i.e.*, when the price savings are passed on to the consumer, the patient will be alerted to the change in drug by the reduction in price. Questions concerning the drop in price will then be answered by the physician or pharmacist, and the answer will include disclosure of the substitution of the generic drug. *See* N.J.S.A. 24:6E–7–10.

Thus, imitating the trade dress of a brand name to conceal from the patient the fact that he or she is getting a generic, is ultimately futile, if, as is usually the case, the physician and pharmacist fulfill their responsibilities. From one source or another, most patients will become cognizant of the switch.

Defendants are no more successful in supporting the second prong of the argument: switching causes an "anxiety" that diminishes the effectiveness of the drug. Dr. Griep, the plaintiffs' physician whose testimony I credit, testified that patients whom he did not advise about the switch have telephoned him after they have received a generic with an appearance different from that of the accustomed brand name medication. After he explained the situation, his patients accepted the substitution without anxiety. Dr. Griep, Tr. 189–90. *See* Dr. Stoffer, Tr. 91.

The testimony of Dr. Bloom, one of the defendants' witnesses, did not aid the defendants. Dr. Bloom testified that in prescribing drugs, he tells the patient of their appearance and that the generic may not be a look-alike. These explanations almost always allay any doubts the patients might have had.[12] Dr. Bloom testified that in some 13 years of practice, with some 5,000 patients, he had only 1 or 2 patients who would not take a generic equivalent of a different color than the brand name the patient was getting. Tr. 579. The solution employed by Dr. Bloom in this rare case is simple and available to other doctors: maintaining the patient on the same medication. Tr. 568. Moreover, even as to these

few cases, defendants did not elicit from Dr. Bloom that the patients would have accepted a generic look-alike.

Not one physician or pharmacist testified that he or she would *not* inform the patient of the switch, irrespective of whether the generic had the same appearance as the brand name. If "anxiety" were such a difficult problem, one would have expected defendants to produce testimony that physicians and pharmacists routinely omit any mention of the substitution when discussing medication with patients. Yet no such testimony was forthcoming.

Defendants did introduce testimony that pharmacists would prefer not to discuss the fact of substitution with customers. Mr. Sperber, an employee of Henry Schein, a generic distributor for Premo's dipyridamole, was disarmingly frank: pharmacists do not want generic non-look-alikes because they always necessitate an explanation to the patient. This testimony, though, did not demonstrate that non-look-alikes promoted "anxiety"—it did show that patients who suddenly are given a non-look-alike may wonder why they have received a drug with a different appearance. It also suggests that at least some pharmacists may not advise a patient of a "switch."

Defendants' "anxiety" argument is without merit. If legitimate medical and pharmaceutical practices are followed, the patient knows that he or she is having a generic substituted at a lower price. If the patient is alarmed, the fears usually will be relieved by discussion. And if the patient remains "anxious," the doctor can resume use of the name brand medication. Each of these general propositions holds true for dipyridamole, regardless of whether defendants use orange biconvex tablets or pink-and-green capsules.

Defendants' "anxiety" argument is plausible only under circumstances which do not advance defendants' position. To eliminate patient "anxiety," as defendants claim they have done, the patient must not be told of

---

12. Dr. Bloom said that in some cases, "[t]he patient might be upset that he has a different

pill until I could explain to him that it was just the same pill, other company. *See* Tr. 583, 585.

having been "switched." Under the defendants' approach, the physician would not alert the patient, and the pharmacist, in filling the prescription, would say absolutely nothing to the patient of the displacing of the name brand by the generic—and would charge roughly the same price as for the trade name drug. The result: the patient suffers no "anxiety" because the patient does not know of the "switch." Patient "anxiety" is eliminated by pharmacy deception and resultant patient ignorance.

I now turn to the second of defendants' reasons for copying Persantine's appearance—it enables patients to identify by color the medication to be taken for each ailment. From the testimony of Dr. Bloom, Tr. 557, and Mr. Sperber, Tr. 288 *et seq.*, the defendants argue that once on an orange tablet for their angina pectoris, patients must remain on an orange tablet when "switched" from a brand name to a generic drug. Yet defendants offered no testimony to support the fundamental, if unarticulated, premise that patients cannot mentally adjust to "switching" from an orange "heart pill" to a green "heart pill." In the absence of such testimony, I am unwilling to believe it to be beyond the ability of patients to stop associating orange with their heart medicine and start thinking of green as the color of the pill taken for their heart condition.

Dr. Bloom's color chart does not support defendants' "color" argument. *See* Tr. 553; 558; D.Pr.Ex. 53. When Dr. Bloom "switches" a patient to a generic of a different color than the brand name, he can simply change the card given the patient, at the same time advising the patient that the

"new" drug will be green in color instead of red. Tr. 557; 563.

The last of the principal reasons advanced by defendants for their copying Persantine's appearance is that it will aid physicians in emergency situations in identifying the drug taken by a patient who has overdosed. Dr. Bloom, Tr. 571–74.

I do not believe that the goal of assisting physicians played any part in the defendants' decision to simulate Persantine's trade dress. Dr. Bloom, testifying for the defendants, completely discredited this rationale in a colloquy with the court.

> THE COURT: What I'm trying to get at is there ... any conceivable benefit in an emergency situation to have a generic match in shape, color and size Boehringer Ingelheim's Persantine?
>
> THE WITNESS: Specifically for Persantine you say?
>
> THE COURT: Yes.
>
> THE WITNESS: Well, since I don't think it can engender a kind of emergency room visit of the kind we discussed, I don't think it's pertinent here ....

Tr. 575. *See also* Dr. Griep, Tr. 181.

Additionally, even if Persantine were a drug that could produce overdose situations, defendants undermined their argument that color would be useful in identifying the active ingredient.

During cross-examination of plaintiffs' witness Norman Hacking, Premo's counsel asked, "I take it you don't dispute that there are drugs which are identical in appearance to that dipyridamole manufactured by your company?" Hacking answered: "I don't dispute that?" Tr. 56.[13]

---

**13.** Edward Stemple's supplemental affidavit opposing plaintiffs' motion for a preliminary injunction also made the point that there are drugs similar in appearance to Persantine in other treatment areas:

> I wish to advise the Court that, in my opinion, there is nothing unique or distinctive about the appearance of plaintiffs' Persantine. The color orange is a very popular color in the pharmaceutical field and has been widely used. There are several tablets manufactured by third parties which have essentially the identical color and I know of

at least one tablet which is essentially identical in appearance to plaintiffs' Persantine." The parallels between Premo's position here and its arguments in *SK&F* continue to be striking. Stemple filed an affidavit in *SK&F* arguing that "standardization is highly desirable in emergency situations, where the color, size and shape provide rapid identification of the product to which a patient has overdosed." *Id.* at 1060. The same assessment appears verbatim in the first affidavit filed by Stemple in this case. ¶ 19.

Thus, the three principal reasons advanced by defendants to explain their copying are bereft of merit.

The defendants also insist that they help to fulfill the purpose and spirit of the generic substitution laws of the various states by mimicking the appearance of Persantine. Actually, the state laws called to my attention do not address the question of look-alikes. If any state.. believed it to be desirable to have generics imitate name brand drugs, the generic drug substitution laws could have authorized look-alikes. Yet, apparently no state has acted to approve look-alikes by generic companies. Therefore, I fail to perceive how defendants' simulation of Persantine's trade dress furthers legislative goals in the enactment of generic substitution laws.

Indeed, the actions of defendants may conflict with the public policy embodied in most drug substitution legislation. As I have pointed out, generic substitution laws contemplate that the patients will be advised of any "switch" to a generic; consumers are to be informed of a change in drug manufacturers of their medication. As is demonstrated below, defendants' decision to copy Persantine's appearance, instead of advancing that goal, may thwart it. See N.J. S.A. 24:6E–7–10.

A subsidiary justification tendered by defendants for borrowing Persantine's appearance is that generic drug manufacturers for at least 30 years have manufactured nonbranded generic products in the same color, size, and shape as the corresponding national branded products.

To support this contention, defendants submitted an exhibit of generics that look the same as their name brand equivalent.

D.Pr.Ex.4. Yet, this proves little, for plaintiffs have countered with an exhibit of generic drugs looking nothing like the corresponding national brand. P.Ex. 85; 141, 141a–i. In *SK&F v. Premo*, Judge Gibbons wrote that:

> [t]he parties conceded at the argument on the application for preliminary injunctive relief that although an exhibit could be devised showing numerous examples of generics that have adopted the form and appearance of the branded drugs, an exhibit of like number of dissimilar generics could be prepared as easily.

At 1060 n.3. The record in this case confirms the validity of that concession—both look-alike and non-look-alike generics are currently being marketed.

It should also be noted that in his deposition defendant Blackman recognized that branded generics—generally a generic product put out by a larger pharmaceutical firm—have an appearance different from that of the branded drug. Speaking of branded generics, Blackman said their manufacturers "make their product distinguishable in one way or another, be it slight or gross." Dep.Tr. 26.[14]

The defendants produced testimony of doctors and pharmacists that all generics should look like their brand name equivalents. This, of course, would simplify the job of those physicians and pharmacists who wanted to be relieved of the responsibility and necessity of telling patients that there has been a "switch" from a brand name to a generic. Patients kept in the dark about the change will be neither curious nor querulous.

Yet this testimony is a two-edged sword. It tends to substantiate plaintiffs' claim

---

In his *SK&F* affidavit Stemple had also observed that *SK&F*'s Dyazide was not unique in appearance, for several other drugs looked similar. Judge Gibbons found it inconsistent to say that copying would help doctors to identify a drug in an emergency situation while simultaneously saying that the drug being copied looks very much like several other drugs. That same tension exists here.

**14.** Mr. Blackman also said that producers of branded generics "in some way ... try to dis-

tinguish their product. It might be putting their name on it. It might be in the color of the capsule if it is ·a capsule. It may be in the shape of a tablet or the color or size that is a tablet. If it is a liquid, it is probably the color that is different. But in one way or another they try to distinguish their branded generic so that it can be identified as their brand. And they create a demand for it .... Dep.Tr. 25–26.

that pharmacists who do not relish explaining the "switch" may be tempted to take advantage of the opportunity afforded by generic look-alikes to change medications without telling their customers.

I do not accept defendants' testimony that generics ought to look like their name brand counterparts. Instead, I credit the contrary testimony offered by plaintiffs. Dr. Stoffer clearly and convincingly explained why he had concluded that generic drugs containing the same ingredients as brand name drugs "should be made in different colors, sizes or shapes." Tr. 88.

I found many patients in my personal practice had been substituted to a generic drug without their knowledge and consent. And when you ask these patients, in fact, what drug they're taking, they name the brand name drug, and it was no small wonder that they did, since the bottle was labeled by the pharmacist in practically all cases with the brand name, and since the prescription that I wrote for that patient was for the brand name drug, and since they were not advised by the pharmacist that the drug dispensed was anything other than the brand name drug, they came to the conclusion that that's what they were taking, and since the tablet inside the bottle looked very much, size, color, shape like the brand name tablet, they assumed that they were taking the brand name tablet.

Tr. 89. *See* Tr. 90.

From the testimony adduced at trial, it has become abundantly clear to me that defendants deliberately decided to copy the size, shape, and color of plaintiffs' Persantine. And it has become equally clear that the reasons provided by defendants for copying Persantine's appearance are utterly specious.

This leaves open the question of what actually motivated the defendants to imitate Persantine's trade dress. My review of the evidence persuades me that the explanation of defendants' conduct is that such copying increases sales of their generic dipyridamole because unscrupulous pharmacists will buy it to pass it off profitably as Persantine. Several lines of analysis lead ineluctably to this conclusion.

Without evidential support, and internally inconsistent, the reasons proffered by defendants for their copying in and of themselves suggest the existence of an improper motive. Since the institution of this lawsuit, defendants have argued that sound pharmacological and medical practice dictated their decision to sell small orange biconvex dipyridamole tablets. However, as I demonstrated above, none of these arguments survives close scrutiny.

On the one hand, there is a dearth of credible evidence to substantiate defendants' explanations for why they copied, *e.g.*, patient anxiety, emergency room identification in case of overdose, et cetera. At the same time, defendants are trapped by their own arguments. For example, Pharmadyne, in its Proposed Findings of Fact 45–50, emphasizes the importance of the placebo effect in giving patients relief. Thus, Pharmadyne contends, "If patients who had been taking Persantine were switched to the generic version which had a different color, they will suffer anxiety which would limit the effectiveness of the drug making it inferior to Boehringer's Persantine solely because of the placebo effect." *Id.* 46. Yet, Pharmadyne also maintains that its logo will enable consumers to know the source of their medication. Thus, plaintiffs' Proposed Finding of Fact 28 says, "Defendants' copying of the PERSANTINE [(R)] appearance for their generic dipyridamole makes detection of substitution of defendants' products for PERSANTINE [(R)] difficult, if not impossible, for consumers." Pharmadyne responded: "Pharmadyne's logo on its tablets and Boehringer's imprints on its products make it easy to identify the respective products." Pharmadyne Critique 28. Surely, if patient "anxiety" were a genuine concern, Pharmadyne would not place on its products a mark designed to alert patients they were now getting a new brand of medicine.

The fact is that neither defendant company has come forward with a legally acceptable reason for copying Persantine's appear-

ance. I am virtually compelled to draw the inference that the unstated, but actual, reason for their having duplicated Persantine's trade dress is that defendants hoped to gain sales by having pharmacists pass off the look-alike dipyridamole as Persantine.

Some direct support for this inference comes from defendants' advertising. Both defendants clearly set forth in their advertisements that their dipyridamole can be bought in place of plaintiffs' Persantine. For example, a Premo distributor, Henry Schein, Inc., provides the pharmacist readers of its catalogue with the following message: "NEW GENERIC! Compare to Persantine Dipyridamole Tablets 25 mg. Orange-Sugar Coated" P.Ex. 64a.[15] By drawing attention to the comparability of the products and the identity of colors, defendants have made drug wholesalers and pharmacist buyers of generic dipyridamole aware that the customer can be surreptitiously given their less expensive generic product in the place of the more costly Persantine.

Further evidence that defendants expect pharmacists to "pass off" their dipyridamole for Persantine comes from a letter written by Blackman to pharmacists. In his letter of January 10, 1980, Blackman analyzes for his customers the consequences of the district court's decision in *SK&F v. Premo*. After warning pharmacists of the "hazardous situations and grave economic consequences which would ensue"—these essentially being a rehash of the justifications offered in this court for copying—Blackman raises the following specter:

> Equally disconcerting is the heavy economic impact upon the dispensing pharmacist. How does an injunction against look-alike generic drugs affect you economically? As each manufacturer comes into the marketplace with a product which is being made by one of his competitors, the newcomer will have to choose a different color, shape and size from each preceding manufacturer. To enable *you* to legally and properly fill any and all "no substitute prescriptions," you will be obliged to inventory every manufacturer's product, no matter how small the demand. You would literally have tens of thousands of bottles on your shelves, for which you have no room and your dollar inventory would increase 100-fold, which you cannot afford.

P.Ex. 70 (emphasis in original).

This statement is rather curious. One would think that as manufacturers entered the market, a pharmacist would have to stock the product of each manufacturer to fill properly a "no substitute prescription," *regardless of color*, of the new product. Color, therefore, should not affect a pharmacist's decision whether to carry the new entrant's drug. The size of an inventory ought to be independent of the colors of the drugs comprising that inventory. Color becomes relevant only if the pharmacist intends to substitute a look-alike drug for the medication actually written on the prescription. If substitution takes place, then the pharmacist need not carry numerous other look-alikes; one or two will do.

The implication of Blackman's statement is clear and unavoidable: The advantage to pharmacists of generic look-alikes is that they allow the pharmacist to buy a smaller number of products. And the only way a pharmacist can obtain that advantage is to dispense the look-alike generic without regard to the brand name actually appearing on the prescription form.[16]

As noted earlier, defendants had no legitimate medical reason for imitating the appearance of the Persantine tablet. The reason suggested by the evidence is that defendants hoped to capture quickly a large share of the market and that this could be done only by enabling pharmacists to pass off dipyridamole as the more expensive Persantine.

---

15. Bedrick stated at his deposition that some of Pharmadyne's wholesalers advertise generic dipyridamole by reference to Persantine. Dep.Tr. 52.

16. Blackman's reference to "legally and properly" filling prescriptions must be discounted in view of the obvious thrust of his letter and its appeal to the pharmacists' economic interests.

Defendants' desire to acquire rapidly a sizable market share is reflected by the evidence concerning their marketing practices. For example, both defendants began to sell their dipyridamole several months before plaintiffs' patent expired. Once plaintiffs brought suit, the defendants readily consented to an injunction on the patent infringement claim. The obvious inference, therefore, is that the defendants began selling dipyridamole before patent expiration, not because they believed the patent invalid, but to gain a running start in penetrating the dipyridamole market.

When defendants began producing their generic dipyridamole, they faced substantial barriers in penetrating the market. For over 12 years Persantine had been the sole brand of dipyridamole available. Defendants were aware that physicians, who had been the targets of repeated major promotional campaigns by Boehringer, and who had confidence in Persantine as an effective medicine, would not readily abandon Persantine for generic medication. They also knew that patients on Persantine for years, or at least many months, would not quickly shift to a generic if given a choice through notice. Additionally, they knew their products were not on the New Jersey Formulary.

The reality of those fears that doctors would not quickly allow pharmacists to substitute their dipyridamole for Persantine is borne out by the testimony of Bernard Koff, plaintiffs' witness. Mr. Koff, whose testimony I credit, is president of Market Measures, Inc., a pharmaceutical research agency conducting audits in the prescription drug field. Since being founded in 1968, Market Measures has run more than 100 surveys.

In September 1979 Mr. Koff's firm performed a seven-state audit on behalf of plaintiffs. The seven states—Delaware, Illinois, Missouri, New York, Pennsylvania, Virginia and Washington—were selected because they had double-line signature laws. That is, in each state a doctor, when prescribing medication, must sign either the line on the prescription form authorizing substitution or the line prohibiting substitution. Because doctors are compelled in these states to decide whether substitution should take place, auditing prescription forms provides some measure of the preference, if any, for the brand name drug.

The survey undertaken here consisted of reviewing all prescriptions on file at 188 pharmacies. Over 125,000 prescriptions were examined. The researchers found approximately 590 prescriptions written for Persantine; of these, 520 were on a prescription blank where the double line was used. Significantly, of the 520 prescriptions for Persantine where the doctors chose to permit or prohibit substitution, physicians disallowed substitution 78 percent of the time. *Id.* Mr. Koff testified that the forms uncovered by the researchers were written by over 200 different doctors. Tr. 138.

The survey in question was not a probability sample but, rather, a stratified quota sample. In a probability sample, all members of the universe are equally likely to be selected; in a stratified quota sample, the sample is chosen in such a way that it will be composed of a specified proportion of objects with a particular trait. Tr. 214–16. Thus, in the audit of Persantine prescriptions, the pharmacies to be included in the survey were not chosen randomly from a list of all pharmacies but were selected to provide a sample with specified percentages of stores that were rural or urban, independent or chain-owned; statewide geographic distribution was also sought. Tr. 216.

Because the survey was not a probability sample, the results cannot be statistically extrapolated to the universe.[17] Tr.

---

17. In seeking to exclude the Koff survey, defendants have relied primarily on *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978). Defendants have interpreted that decision as forbidding use of any sampling technique other than that of probability sampling. Apparently, defendants believe that only a probability sample comports with sound statistical methodology and produces statistically valid results. Defendants are incorrect. *See, e.g.,* W. Wallis and H. Roberts, The Nature of Statistics 146 (1962); M. Hansen, W. Hur-

131. Therefore, I will not accord the survey as much weight as I would a probability sample. Nonetheless, the survey deserves some weight. Mr. Koff testified that in at least 25 studies the results obtained from a stratified quota sample were similar to the findings generated by a probability sample. Tr. 217. The technique has been used in the pharmaceutical market research field for a long period of time; and it is an accepted tool in that field, as well as in other areas of market research. Mr. Koff concluded that stratified quota samples yield results comparable to those of probability samples. I accept this testimony.

I also note that the defendants had months to prepare their own study to meet the results of Mr. Koff's, whose report they had been given. They did not do so. Addi-

tionally, the defendants, through the testimony of Drs. Gatty and Abelson, attacked the validity of the Rittenhouse survey; neither, however, challenged the Koff survey.

■ Accepting Mr. Koff's survey,[18] I find that it tends to show that a substantial majority of doctors prescribe Persantine and do not allow substitution. This illustrates the problems confronting the defendants in their drive for prompt market penetration.[19] In most states, if a physician prohibits substitution, the pharmacist may not lawfully substitute. Thus, as defendants correctly anticipated, a large part of the potential market would be closed to them where doctors prohibited substitution for Persantine.[20] The only way to overcome such prohibition is to have pharmacists fill a Persantine prescription with ge-

witz, & W. Madow, 1 Sample Survey Methods and Theory 183 (1953). Defendants have also overlooked the uncontradicted testimony of Mr. Koff. He said that stratified quota samples yield results comparable to those of random samples. This, too, supports the view that surveys can be reliable even if not based on a probability sample.

Accordingly, I decline to adopt defendants' view that *Pittsburgh Press* requires as a matter of law that surveys be excluded if they do not randomly draw samples from the entire universe. Other statistically valid devices exist, and they may be used.

18. Although the survey partook of some aspects of the stratified quota sample, it was not a true stratified quota sample. On cross-examination Mr. Koff was asked the following question: "So far as we know, the pharmacies that you went to could have been atypical pharmacies. Is that not correct?" Mr. Koff responded, "The instructions to the field supervisors were to select typical pharmacies meeting those criteria." Tr. 134. *See* Tr. 223.

Thus, it appears that supervisors were given discretion in selecting individual pharmacies within the various strata. However, to have a stratified quota sample, "within each stratum, the sample must be a probability sample; we do not permit judgment to enter into the selection of the individual sampling units." M. Hansen, W. Hurwitz, & W. Madow, 1 Sample Survey Methods and Theory 183 (1953). *See* W. Wallis and H. Roberts, The Nature of Statistics 146 (1962); D. Freedman, R. Pisani, & R. Purves, Statistics 305–07 (1978).

Defendants never addressed this flaw in the Koff survey. They objected solely on the ground that it was not a probability sample, and therefore incapable of statistical extrapola-

tion. *See* note 17, *supra.* Although the survey's deficiency in allowing discretion in choosing a sample was mentioned during cross-examination, defendants failed to pursue this line of inquiry. Defendants had a chance on two different trial days to explore the selection process to determine if it introduced any bias into the survey. They failed to seize either opportunity. Moreover, defendants received Mr. Koff's report in October 1979. They never requested any underlying documentation. Tr. 225. Instead, defendants relied solely on the fact that it was not a probability sample but a quota sample. Tr. 226. *See also* Pharmadyne Critique 42. This reliance was misplaced. *See* note 17, *supra.*

Against this background, I believe the survey was admissible. Despite having ample opportunity to criticize the survey's selection technique as being inconsistent with a true stratified quota sample, defendants raised a completely different objection. *See generally* Fed. R.Evid. 103(a). From Mr. Koff's uncontradicted testimony I find his technique, while imperfect, is sufficiently reliable and trustworthy to be probative on the limited issue for which it was tendered. However, because the survey departed from proper methodology, I will accord the survey only minimal weight.

19. The relationship of this testimony to the question of secondary meaning is discussed at 1055, *infra.*

20. A related, but substantially less serious, obstacle for defendants is the tendency of many doctors to prescribe drugs by their brand or trade name, not by their generic name. See Tr. 578.

neric dipyridamole without telling the customer. And to avoid arousing suspicion in the patient, the generic product must be of the same appearance as the brand name medicine and sold at the same price.[21] As defendant Blackman said in his letter to pharmacists, if patients are given a different colored medicine, they will become inquisitive: "Are you sure this is the same medication I received last time? It looks different." "I think you made an error." "Please call my physician and double check." "This medication isn't the same as I previously had taken." P.Ex. 70.

Accordingly, I find that defendants simulated the appearance of plaintiffs' Persantine-brand dipyridamole tablets in order to rapidly penetrate the market and thereafter increase sales by enabling pharmacists to pass off surreptitiously their dipyridamole as Persantine. I further find that the defendants Blackman and Bedrick were personally responsible for the decision of their respective companies to market a tablet virtually identical with Persantine.

### III

Under the general rubric of unfair competition, plaintiffs have alleged that defendants have committed the tort of unprivileged imitation. Defendants disagree, contending that plaintiffs have failed to establish the necessary elements of that tort.

■ To make out a claim of unprivileged imitation, one must show both nonfunctionality and secondary meaning. These are necessary elements both under New Jersey case law and the Lanham Act. *SK&F v. Premo, supra*, at 1063, 1066.[22]

Dipyridamole is a yellow powder. The initial choice of color of the Persantine tablet was arbitrary and unrelated to any therapeutic effect; this is also true with respect to its size and shape. The maintenance of this size, color, and shape has also been arbitrary.

In the United States, Persantine is marketed as an orange tablet; in Germany, plaintiffs' wholly owned subsidiary markets it as a yellow tablet. I accept and credit Dr. Griep's testimony that the color, size, and shape of Persantine are not functional. Dipyridamole in the dosage of 25 mg. can be marketed in an infinite combination of colors, sizes, and shapes.

Pharmadyne has contended that Persantine's trade dress is actually functional. I reject that claim. Indeed, defendant Blackman testified to the contrary.

Q So, for the first-time users of dipyridamole the size, shape, and color of the tablet has no therapeutic function; isn't that correct?

A I would say that is quite correct, in my opinion.

Dep.Tr. 46.

I turn now to the question of secondary meaning.

The field of cardiovascular pharmaceutical preparations, as defined in the 1979 Physicians' Desk Reference, includes more than 200 products. The overall appearance of Persantine brand dipyridamole in this field is unique. *See* P.Ex. 136.[23] I find unpersuasive defendants' evidence purporting to show a lack of distinctiveness. Tr. 55–63.

**21.** "Many patients, especially those on heart medication, will never permit a prescription to be completely exhausted before renewing it. Accordingly, it is highly likely that a patient will see the generic and brand name products side by side." Pharmadyne Critique 60. This statement dramatizes why defendants perceived the need to initiate Persantine's trade dress. They believed that anything less than a strikingly similar drug would be detected because of the possibility of side-by-side comparison by consumers.

**22.** This portion of the opinion will focus on the evidence relating to the issue of secondary meaning; a more comprehensive treatment of the legal aspects of this issue is contained under V, 1060, *infra*.

**23.** P.Ex. 136 is a chart prepared by Dr. Griep of all cardiovascular drugs in the Physicians' Desk Reference. All cardiovascular preparations have been placed on the chart. The chart provides a visual confirmation of plaintiffs' claim of distinctive appearance within the cardiovascular field.

Plaintiffs have expended a good deal of time, money, and energy in developing Persantine's sales. For more than 15 years Persantine brand dipyridamole has been promoted to physicians and pharmacists for use in treating patients suffering from certain cardiovascular disorders. Throughout that period Persantine has been marketed in its distinctive orange-colored, smoothly rounded, biconvex trade dress.

Boehringer has some 450 scientifically trained sales people who call on doctors to inform them of Boehringer's products. On any given day these sales people will visit some 3,000 doctors in the United States; "a very large percentage of those calls would concern Persantine." Tr. 17. Boehringer also advertises Persantine in medical journals. At any one time these advertisements will appear in not less than 20 separate journals. Supplementing visits by sales people and advertisements in periodicals, Boehringer also sends mail directly to physicians on a regular schedule. Additional promotion of Persantine takes place at medical conventions. For the last seven or eight years physicians have been given over a thousand samples per month for their personal use.

The cost to Boehringer since 1972 of these promotional activities has exceeded $15 million. This excludes costs allocable to sales force efforts.

These vigorous sales campaigns have produced excellent results. Since 1972, Boehringer has sold over two billion Persantine tablets.

Nonetheless, defendants argue that Boehringer's trademark is no longer valid. This is simply not so. To protect its trademark, Boehringer has displayed the word Persantine in prominent lettering, as well as the registered trademark "R" designation. The word dipyridamole accompanies the trademark Persantine to inform the consuming public that Persantine is a trademark for dipyridamole. In all of Boehringer's promotional advertising the generic name dipyridamole has been stated, making it clear to physicians and pharmacists that Persantine is, in fact, the trademark.

Moreover, many of Boehringer's promotional efforts have been designed not only to familiarize doctors and pharmacists with the name "Persantine" but also with Persantine's appearance. P.Ex. 2 is a typical example of Boehringer's attempt to link in the mind of physicians the name "Persantine" and its appearance. The advertisement reads, "Persantine brand of dipyridamole is available as round orange sugar-coated tablets." Similarly P.Ex. 3 shows that plaintiffs, contrary to defendants' assertions, have endeavored to highlight for doctors Persantine's appearance: "Persantine brand of dipyridamole is available as round orange-colored orange sugar-coated tablets of 25 milligrams." *See* P.Ex. 4–6. P.Exs. 11 and 15, among others, refute defendants' contention that Boehringer did nothing to promote pharmacists' associating Persantine's trade dress with the Persantine product.

Accordingly, I find that heavy promotion of plaintiffs' Persantine has taken place, and that this promotion has emphasized both the appearance and origin of the product. I further find that physicians are motivated to prescribe Persantine, and pharmacists purchase it, because of its source. These facts add up to highly persuasive evidence of the existence of secondary meaning.

The defendants' decision to copy Persantine's appearance also supports the conclusion that Persantine's trade dress has acquired secondary meaning. Defendants deliberately chose to imitate Persantine's appearance. As demonstrated above, the decision to simulate plaintiffs' product was not motivated by legitimate business or medical concerns. Product simulation occurred so that defendants' generic dipyridamole could be sold to customers without their resisting substitution. Imitating Persantine's appearance served no purpose other than to eliminate problems defendants anticipated in selling their dipyridamole if it were dissimilar from Persantine.

This, then, is the key: Defendants' marketing practices are convincing evidence of their belief that consumers would not ac-

cept a differently colored form of dipyridamole. Persantine's appearance was nonfunctional when originally selected by Boehringer. It remains nonfunctional today. The sole value to Boehringer of Persantine's appearance is that it identifies the source of the pills for users.

Defendants, recognizing that consumers believed the orange color indicated the source of their medicine, knew that a pink or maroon or green pill, or an orange pill of different size or shape, would not be accepted. Indeed, defendants' lawyers admitted this point at oral argument: "The reason we're doing this is to gain patient acceptance so as not to alarm the patient with a different color." Tr. 41–42. And the reason a different color or shape or size would not be accepted was precisely because the patient would then know that the pill was originating from a new source. Dispensing generic dipyridamole when the prescription calls for Persantine can take place without detection by the patient only if the patient is not alerted to the fact that he or she has been switched to medicine coming from a different source. Persantine's trade dress has acquired secondary meaning; therefore, only if the substitute has the same trade dress can the buyer be misled into thinking that the medicine comes from the accustomed source. Conversely, if trade dress does not indicate source, varying the appearance would not cause the patient to think the medicine originated from an unfamiliar source, because the patient would not associate appearance with source. Thus, defendants' selection of a tablet with trade dress virtually indistinguishable from that of the plaintiffs' betrays their belief that the plaintiffs had established secondary meaning in the Persantine trade dress.

■ Putting together plaintiffs' advertising of Persantine, the commercial success of Persantine, the efforts to educate doctors and pharmacists as to Persantine's appearance, the results of the Koff survey,[24] the decision of defendants to simulate Persantine's trade dress, and the utter lack of justification for that decision, I find that

plaintiffs have proved secondary meaning as to Persantine's trade dress. Since Persantine's trade dress is nonfunctional, plaintiffs have established the two elements of the tort of unprivileged imitation.

■ At trial, plaintiffs offered into evidence the results of a survey they commissioned Dr. Marguerite Rittenhouse to perform. The purpose of the survey was to determine if patients, pharmacists and doctors would associate the name "Persantine" with a small, orange biconvex tablet. Defendants moved to exclude the survey and Dr. Rittenhouse's testimony. At trial I decided that both her testimony and the survey should be admitted, with any deficiencies in survey design or execution going merely to the weight of the evidence. Upon further reflection, I have concluded that the survey should not have been admitted.

Properly conducted surveys are admissible. The Court of Appeals for the Third Circuit has discussed the attributes common to well-run surveys.

A proper universe must be examined and a *representative* sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purpose of the survey or the litigation.

*Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir. 1958). Because the Rittenhouse survey did not satisfy several of the requirements set forth in *Pittsburgh Press,* defendants' motion to strike the survey and the Rittenhouse survey will now be granted.

---

**24.** I would still find secondary meaning present even if the Koff survey were given no weight.

One problem with the survey was that plaintiffs' attorneys were involved in designing the questions that were to be asked. *See, e.g.,* Tr. 443–44. This conflicts with the admonition in *Pittsburgh Press* that surveys be designed without guidance from lawyers.

A second weakness of the survey stems from Dr. Rittenhouse's knowledge of the purpose of the survey. According to *Pittsburgh Press*, the person conducting the survey ought not to know the goals of the party paying for the survey. Dr. Rittenhouse, however, did know the aims of the survey; indeed, at trial she testified both as to what were, and were not, the survey's objectives. *See* Tr. 535–36. *Cf. James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 278 (7th Cir. 1976) (interviewer unaware of survey's purpose).

The most serious defect in the survey arises out of Dr. Rittenhouse's method of selecting subjects to be interviewed. Initially, I admitted the evidence on the basis of Dr. Rittenhouse's statement that a sample yielded by her technique would produce results comparable to those from a probability sample. However, upon further reflection, I now believe that the lack of any effort to ensure that representative interviewees were obtained, *see, e.g.,* Tr. 444–46; Dep.Tr. 56–57; 125–27, when combined with the other faults of the survey, requires the survey to be ruled inadmissible.

To put it mildly, the selection process used here was haphazard. Doctors were visited because they were high prescribers of Persantine; patients were interviewed because doctors or pharmacists told Dr. Rittenhouse the names of Persantine users. *Pittsburgh Press* stressed the importance of choosing a representative sample. 579 F.2d at 578. *See Bank of Utah v. Commercial Security Bank,* 369 F.2d 19, 27 (10th Cir. 1966), *cert. denied,* 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1977) ("A survey is inadmissible when the sample is clearly not representative of the universe it is intended to reflect"); *Donohue v. Board of Elections of State of New York,* 435 F.Supp. 957, 970 (E.D.N.Y.1976); *Allen v. Morton,* 333 F.Supp. 1088, 1094 (D.D.C.1971); The Manual for Complex Litigation 2.716 (Tentative Draft 1980); Note, *Public Opinion Surveys as Evidence: The Pollsters Go To Court,* 66 Harv.L.Rev. 499 (1953); Handbook of Recommended Procedures for the Trial of Protracted Litigation, 25 F.R.D. 351, 429 (1960). Yet the sample comprising the survey introduced by plaintiffs simply is not representative.[25]

I do not believe prejudice will accrue to any party as a result of my decision to exclude the Rittenhouse survey at this stage of the proceeding. Defendants surely are not harmed, for they have accomplished one of their long-standing objectives: the exclusion of survey done by Dr. Rittenhouse. And plaintiffs will suffer no injury, for the other evidence in the record is sufficient to show that secondary meaning exists.

### IV

Plaintiffs alleged in their complaint that the defendants, by distributing generic dipyridamole in a trade dress that invited confusion and passing off, have violated § 43(a) of the Lanham Act, the New Jersey Unfair Competition statute, and New Jersey common law. I find that plaintiffs have proved their claim by a preponderance of the evidence.

As clearly appears, defendants deliberately copied the arbitrary trade dress of plaintiffs' product. In *SK&F v. Premo, supra,* at 1062, Judge Gibbons stated that "it has been held that it is actionable under New Jersey law for a drug manufacturer to put a product in the hands of a pharmacist in a form in which the manufacturer can rea-

---

**25.** The result reached here is not inconsistent with my determination that the Koff survey is admissible. Koff's survey of pharmacies is defective in but one respect, and that concerns a point defendants have never raised. By contrast, the Rittenhouse survey suffers from several flaws, all of which were noted by defendants and which plaintiffs had a chance to address. Moreover, Koff's selection of a sample may not be problem-free, but it does not reflect the numerous substantial shortcomings present in the Rittenhouse survey.

sonably anticipate that it may be passed off as another product even if the manufacturer does nothing else to encourage passing off.[26] Under this formulation, defendants' liability is clear.[27] Not only did defendants anticipate passing off; they courted it through advertising and counted on it to boost sales.

Plaintiffs also adduced some evidence of actual passing off. While not conclusive, this evidence supports plaintiffs' contention that defendants have facilitated the passing off of generic dipyridamole as Persantine by copying Persantine's trade dress.

At the request of plaintiffs, Pharmacy Practices Review, Incorporated, undertook a field survey to determine what medicine would actually be dispensed when a physician prescribed Persantine. Robert Taylor, president of Pharmacy Practices Review, and Aubert Schwartz, its field director, detailed the methodology of the survey. Based on their testimony, which I credit, I find the survey to have been conducted properly and to be probative on plaintiffs' claim of passing off.

During the survey, 79 different pharmacies were shopped. Of the 79 pharmacies, 57 dispensed Persantine and labeled the vial correctly. As P.Ex. 66–1A reflects, 22 pharmacies did not dispense Persantine, though the prescription called for Persantine. Plaintiffs do not contend that in each instance the dispensing of generic dipyridamole instead of Persantine constituted passing off. For example, a drugstore in Sunrise, Florida, labeled the bottle "GENERIC FOR PERSANTINE. 25MG"; a pharmacy in Millville, New Jersey, wrote on the label that it was dispensing "Dipyridamole 25mg." Consumers receiving generic dipyridamole in vials labeled in this fashion will not be misled into believing they have been given Persantine.

However, based on the survey, one can conclude that some consumers receiving generic dipyridamole will not know they are receiving Persantine. Eight pharmacists labeled the vial to indicate that the product was generic but the label also used the name "Persantine."[28] Whether adding the letters "Gen" or the word "generic" actually tells the consumer that he or she is being switched from Persantine is questionable—absent explicit information from the pharmacist. Consumers are unlikely to learn of the change in medication from what is probably, for them, an obscure word or phrase. Moreover, in six instances the pharmacist labeled the medication "Persantine" without any indication on the label that the product was actually a generic.[29]

Attempting to weaken the power of plaintiffs' evidence, defendants, on cross-examination of the buyers used in the survey, brought out the fact that some pharmacists whose labels were misleading orally advised the buyer that he or she was getting a generic drug. Whether this makes clear to a consumer that he or she is not getting Persantine—the name of the drug on the

---

**26.** This also states the federal law of passing off under the Lanham Act. *SK&F v. Premo*, at 1065–1066.

**27.** The uncontradicted evidence in the record supports charging a drug manufacturer with the knowledge that look-alike products will be surreptitiously substituted for the brand named on the prescription. Such occurrences are not statistically rare. Robert Taylor testified that his surveys of pharmacies showed that the drug dispensed is not the drug prescribed between 10 and 20 percent of the time. Tr. 608. Dr. Stoffer has found "many patients" have been switched to a generic drug without their knowledge. Tr. 89.

The Third Circuit in *SK&F* also had evidence before it concerning the likelihood of substitutions. One of plaintiffs' experts there indicated that "a 4% rate of unlawful substitution and a 23% rate of illegal mislabeling could be expected with a $100 million per year product such as DYAZIDE." At 1059. *See also, Hoffmann LaRoche v. Premo Pharmaceutical Laboratories, Inc., supra*, slip op. at 8–10.

**28.** Examples of pharmacists who indicated that the drug was generic but who still used the brand name include "25 mg. Persantine Generic," P.Ex. 144–2, and "Persantine Gen." P.Ex. 144–6.

**29.** *See* P.Exs. 144–4, 8, 10, 11, 17 and 18. One pharmacist in Portland, Oregon, typed on the label the following inscription: "DIPYRIDAMOLE 25 mg (Persantine M. AAH Pharmadyne Jan. 83.)" P.Ex. 144–13.

label—is dubious. However, even if orally contradicting the label eliminates consumer deception, there remain ten occasions on which pharmacists dispensed a generic product without telling the buyer and used the name Persantine on the label. And in five of these instances the consumer had no means of knowing that the vial did not contain Persantine, as named by the physician and written on the label.

■ Defendants, in an apparent attempt to minimize the damage done to their position by the survey, contend that pharmacists labeled the generic dipyridamole product "Persantine" because Persantine has become the generic name for dipyridamole. Unsupported by the evidence, that argument must be rejected. As earlier noted, plaintiffs have introduced voluminous amounts of advertising in which the word Persantine is followed by the small "r" in a circle signifying registered trademark. The plaintiffs' trademark registration is in evidence. P.Ex. 30. Plaintiffs have carefully preserved their trademark by referring to their product as "Persantine brand of dipyridamole." See, e.g., P.Exs. 2, 3, 4.

Defendants' evidence is wholly inadequate to support the claim that the "Persantine" name has become generic. When deposed, some pharmacists said they had labeled generic dipyridamole "Persantine" because they thought Persantine to be the generic name. This evidence is entitled to little weight. Confronted with an inaccurate label, a pharmacist is scarcely likely to admit that he knowingly dispensed medicine under the wrong name. Saying that the name "Persantine" has become generic provides an easy excuse. While the result of plaintiffs' extensive advertising may be that the trade name "Persantine" is more

familiar to pharmacists than the generic name "dipyridamole," this advertising has never suggested that the name "Persantine" can be used interchangeably with the word "dipyridamole."

I accept the evidence provided by the survey as reliable, and probative on the question of passing off.[30]

The shopping survey conducted on behalf of plaintiffs was well designed and performed.[31] The evidence yielded by that survey is reliable and probative. My analysis of that evidence leads me to conclude that the tort of passing off occurred. A consumer would have been completely deceived as to the manufacturer of the drug in five of seventy-nine cases; in ten other instances consumer confusion of varying degrees would have been produced by pharmacists' labeling practices.[32]

V

Plaintiffs allege that defendants, by copying the trade dress of Persantine, have violated the New Jersey law of unfair competition. Disagreeing, defendants contend that under *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting Co.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) that New Jersey "cannot afford relief against copying the appearance or dress of a product." Trial Memorandum for All Defendants at 18.

■ This contention is without merit. Premo raised the same argument in *SK&F v. Premo*, and the Third Circuit rejected it: "[W]e agree with the conclusion reached by the Second and Eighth Circuits that the state law tort of unprivileged imitation sur-

**30.** Defendants have criticized certain methodological aspects of the survey, but have been far less vehement in their objections to its design and execution than in the case of the Rittenhouse survey. My review of the evidence on the design and execution of the shopping survey persuades me that it was properly conceived and executed.

**31.** In *SK&F* the shopping survey turned up four instances of illegal substitution in approximately 70 to 80 purchases. At 1059. The court

used that data to support its view that passing off had occurred. At 1064.

**32.** Neither orally informing the consumer nor indicating on the label that the product is generic will satisfactorily dispel the impression Persantine has been dispensed if the label reads "Persantine." The amount of confusion will depend on what is said and what is written, *e.g.*, GEQ, generic, et cetera.

vives *Sears* and *Compco.* " At 1065. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd.,* 604 F.2d 200, 204 (2d Cir. 1979) ("The question presented . . . is one of trademark law, and it is clear that *Sears-Compco* did not redefine the permissible scope of the law of trademarks insofar as it applies to origin and sponsorship"); *Ives Laboratories, Inc. v. Darby Drug Co.,* 601 F.2d 631, 643 (2d Cir. 1979); *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1214–15 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *A. H. Robins Co. v. Medicine Chest Corp.,* No. 77–1298–C(C), (E.D.Mo. May 12, 1980), slip op. at 10; *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 606 (S.D.N.Y.1979); *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689, 692 (N.D.Ga.1977). Accordingly, I hold that the *Sears-Compco* doctrine does not stand in the way of granting plaintiffs relief under either of their state law tort theories.

One of plaintiffs' two theories is that defendants have committed the tort of passing off. Defendants have steadfastly disclaimed liability under this theory. Based on the findings of fact detailed above, however, defendants' liability is clear.

 Defendants deliberately copied the trade dress of plaintiffs' Persantine. This act, combined with the knowledge attributable to defendants that their imitation would be passed off as plaintiffs' Persantine, suffices to establish liability. The law of New Jersey, as stated by Judge Whipple and adopted by the Third Circuit in *SK&F,* is as follows:

> Basically, then "it is unfair competition for a person to put a product into a dealer's hands which a producer can reasonably anticipate may be easily passed off as the goods of another." *Union Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 336 [366] 384 (7th Cir. 1976); *Stewart Paint Manufacturing Co. v. United Hardware Distributing Co.,* 253 F.2d 568, 575 (8th Cir. 1958). In fact, if the passing off is foreseeable or reasonably may be antic-

ipated, liability rests with the manufacturer even in the absence of any intent to pass off by the manufacturer. (citation omitted)

*Merrell-National Labs, Inc. v. Zenith Labs, Inc.,* 194 U.S.P.Q. 157, 160 (D.N.J.1977), *aff'd on procedural grounds,* 579 F.2d 786 (3d Cir. 1978). *See Reid Murdoch & Co. v. H. P. Coffee Co.,* 48 F.2d 815, 817, 819–20 (8th Cir.) *cert. denied,* 284 U.S. 621, 52 S.Ct. 9, 76 L.Ed. 529 (1931) (The acts of these retail merchants might well have been anticipated by the defendant. These goods were supplied by the defendant for the purpose of being resold on the market, and use of [plaintiff's name] by it made it possible for the retail merchants to commit a fraud upon the public to the injury of the plaintiff."); *A. H. Robins Co. v. Medicine Chest Corp., supra,* slip op. at 8 (defendants "can be held liable for putting their products into various dealers' hands, such as defendant-pharmacists, if they can reasonably anticipate that their goods may be passed off as goods of another"); *Pennwalt Corp. v. Zenith Labs, Inc.,* 472 F.Supp. 413, 418–19 (E.D.Mich.1979); *Coca-Cola Co. v. Snow Crest Beverages, Inc.,* 64 F.Supp. 980, 989 (D.Mass.1946), *aff'd* 162 F.2d 280 (1st Cir.), *cert. denied,* 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). *See generally Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir. 1980).

The case against the defendants on the state law claim of passing off, however, rests on far more than defendants' merely placing into the hands of pharmacists an instrumentality of deception. Through their comparative advertising, defendants suggested to pharmacists the possibility of surreptitiously substituting their dipyridamole for plaintiffs' Persantine. As demonstrated earlier, defendants actually desired that passing off take place. They copied Persantine's trade dress, not out of any legitimate business motives, but to facilitate passing off by pharmacists. By making it easier for pharmacists to substitute generic dipyridamole for Persantine without alerting patients, they hoped to gain quickly a sizable market share. Al-

though the record does not indicate whether the defendants have accomplished their goal in terms of sales, the record does disclose that defendants' product simulation of Persantine has had the desired effect: passing off has taken place.[33]

The defendants have assiduously tried to deflect the force of the shopping survey by raising a variety of arguments. *See, e.g.,* Pharmadyne's Proposed Findings of Fact 88 and 89. The principal objections to giving the shopping survey much weight have already been dealt with. Other arguments, such as the incidence of mislabeling uncovered by the survey being no higher than the rate for other prescription drugs, are simply beside the point. At roughly six percent of the pharmacies generic dipyridamole was substituted for Persantine without the consumer's consent or knowledge and with the label reading "Persantine." Another twelve percent of the pharmacies substituted generic dipyridamole for Persantine, but informed the consumer, in some fashion, either orally or in writing signifying use of a generic product. While not deceptive in the same way as those instances of substitution without any notification, these latter pharmacies sowed the seeds of possible consumer confusion as to source of product. It hardly need be said that neither problem—outright deception nor confusion caused by seeing the word "Persantine" on the label of a bottle containing generic dipyridamole—could arise absent defendants' copying of Persantine's trade dress. Dipyridamole almost invariably involves repeat prescriptions. Therefore, most users of dipyridamole would know that they had been given a different brand of medication, regardless of what the label said, if the generic product was colored differently or shaped differently.

**33.** As Pharmadyne notes in its Proposed Finding of Fact 89, the incorrectly labeled drug was not always a product of either defendant. This is not very significant. Given the striking similarity between defendants' products and plaintiffs' Persantine, defendants can draw no comfort from the fortuitous circumstance that at times another look-alike was passed off, not theirs.

Because they consciously imitated Persantine, defendants made possible the "switching" of consumers for the profit of pharmacists. The copying of Persantine provided the essential ingredient for that practice. Moreover, defendants actually intended that passing off would take place because they, too, stood to profit. The record before me clearly demonstrates that defendants have committed the tort of passing off under New Jersey law.

The federal law of unfair competition differs in no significant respects from New Jersey law. On its face 15 U.S.C. § 1125(a) prohibits passing off. Except for the element of interstate commerce, which is satisfied here, the analysis necessary under the Lanham Act is the same used in assessing the state law claim. *SK&F,* at 1065–1066.

■ Defendants, by imitating Persantine's trade dress and thereby enabling pharmacists to pass off their products, violated 15 U.S.C. § 1125(a).

Plaintiffs' other theory is that defendants committed the tort of unprivileged imitation. In New Jersey, a plaintiff alleging unprivileged imitation must show both nonfunctionality and secondary meaning. *E.g., Squeezit Corp. v. Plastic Dispensers, Inc.,* 31 N.J.Super. 217, 106 A.2d 322 (App.Div. 1954); *French American Reeds Manufacturing Co. v. Park Plastics Co.,* 20 N.J.Super. 325, 90 A.2d 50 (App.Div.1952). Plaintiffs have satisfied both requirements.

Functionality is defined by the First Restatement of Torts, Section 742, as follows:

A feature of goods is functional . . . if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects.

Producing and selling look-alike generics offers pharmacists such substantial incentives for surreptitiously substituting that substitution is virtually inevitable—the results of the survey confirm that that nearly inevitable event has come to pass.

Given this definition, it is obvious that Persantine's trade dress has never been functional. As the record clearly indicates, plaintiffs' selection of Persantine's trade dress was entirely arbitrary. *See SK&F v. Premo*, at 1064. While defendants have weakly suggested that the choice of trade dress had functional aspects, that suggestion is devoid of record support. Certainly plaintiffs could have chosen any color they wanted; they also had considerable flexibility in picking a size and shape. The same is true of the defendants.

Defendants have much more forcefully argued that Persantine's trade dress has acquired functionality through its long use. Even assuming that a characteristic can become functional—a somewhat doubtful proposition [34]—then "[t]he case for functionality . . . depends on the evidence proffered by defendants that copying whatever colors [plaintiff] had chosen served a number of utilitarian purposes." *Ives Laboratories, Inc. v. Darby Drug Co., supra*, 601 F.2d at 643.

As I have already noted, defendants have provided the court with a variety of utilitarian justifications for copying Persantine's trade dress. These justifications verge on the frivolous. I am satisfied that defendants devised these justifications not out of the belief that copying Persantine's appearance advanced any medical or pharmacological goal, but to camouflage their true motives. I reach this conclusion partly because the defendants, despite having over a year to procure evidence to buttress their claims of functionality, came forward with remarkably scanty credible evidence.

The other prong to be considered is that of secondary meaning. "Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origins."

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978) (citations omitted). *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd., supra*, 604 F.2d at 203, n.5. My review of the evidence convinces me that plaintiffs have carried their burden of showing secondary meaning in Persantine's trade dress. Several different facts lead to that conclusion.

Plaintiffs have expended considerable time, money and energy in promoting Persantine to pharmacists and physicians. While extensive advertising by itself does not establish the existence of secondary meaning, advertising can create conditions conducive to the birth of secondary meaning. *See, e.g., Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426, 428 (9th Cir. 1979); *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra*, 589 F.2d at 1228; *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 220, n.2 (7th Cir. 1979) (quoting from district court's opinion); *Union Carbide Corp. v. Ever-Ready, Inc., supra*, 531 F.2d at 380.

The evidence in the record indicates that these promotional efforts have paid off. Persantine's name is widely known, and it enjoys an excellent reputation. The Koff survey suggests [35] that a majority of physicians prescribe Persantine without permitting substitution. It is very significant that a substantial number of Persantine's advertisements—the same advertisements which have helped Persantine acquire its reputation for excellence—either describe or depict Persantine's appearance. The advertisements which have successfully established a reputation for a superior product have simultaneously featured, often prominently, Persantine's appearance. It is difficult to believe that advertisements implanting a favorable image of Persantine in the minds of physicians and pharmacists have failed to create a link between appearance and origin in the minds of those same individuals.

---

**34.** Actually, if a feature is arbitrary to begin with, it will probably acquire with use, not functionality, but secondary meaning.

**35.** For reasons discussed at length earlier, see notes 17 and 18, *supra*, I do not regard the Koff survey as conclusive evidence. But even with its methodological flaws, it still strongly suggests, particularly in the absence of rebuttal evidence, that a majority of physicians prohibit substituting generic dipyridamole for Persantine.

■ Persuasive as advertising and success may be in showing secondary meaning, defendants' own acts are far more powerful. Defendants deliberately copied the arbitrary trade dress of Persantine. Defendants had no legitimate reason for simulating plaintiffs' trade dress. The sole reason why they simulated Persantine's appearance was to increase sales of their products by facilitating the passing off of generic dipyridamole. And it is only because consumers associated a small, biconvex, orange-colored tablet with their heart medicine that defendants had to adopt Persantine's appearance to enable passing off to occur. If defendants did not believe consumers linked Persantine's trade dress, any color would have sufficed. Thus, defendants' decision to copy the arbitrary and nonfunctional trade dress selected by Boehringer constitutes damning evidence of the existence of secondary meaning. *Faberge, Inc. v. Saxony Products, Inc., supra,* 605 F.2d at 428; *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 157 (9th Cir. 1963); *Fremont Co. v. ITT Continental Baking Co., Inc.,* 199 U.S.P.Q. 415, 421 (S.D. N.Y.1977) ("Plaintiffs' intentional imitation of significant features of defendant's family line of packaging . . . is sufficient to establish secondary meaning"); *E. R. Squibb & Sons, Inc. v. Premo Pharmaceutical Labs, Inc.,* 195 U.S.P.Q. 545, 550 (S.D.N. Y.1977); *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288, 1294 (S.D.N.Y.1972). As one court recently put it, "Most persuasive, however, is the inference of secondary meaning that arises by virtue of defendants' own admissions and the act of copying almost every detail of plaintiff's product." *Le Sportsac, Inc. v. Dockside Research, Inc., supra,* 478 F.Supp. at 608.[36] Or, as the Third Circuit said in *SK&F,* at 1064: "The only value of the trade dress was in identifying the goods with their source, and that value suffices in the New Jersey courts to establish secondary meaning."[37]

When examined in light of the applicable legal standards, the facts in the record of this case compel the conclusion that plaintiffs have made out secondary meaning. The combination of lack of functionality of the trade dress and the presence of secondary meaning provide the necessary elements to establish the tort of unprivileged imitation. Accordingly, I hold that defendants have violated New Jersey law by copying Persantine's trade dress.

■ The Lanham Act also proscribes unprivileged imitations. Since the elements of a Lanham Act violation do not deviate in any material respect from the New Jersey law of unprivileged imitation, defendants have also violated § 43(a).

Having determined that defendants have violated both the Lanham Act and New Jersey law, I must now decide whether plaintiffs are entitled to the equitable relief they seek.

> With respect to secondary meaning we cannot say that Ives would necessarily be unable to establish that consumers had come to associate the blue and blue-and-red colors with the trademark Cyclospasmol.... It is significant that, given the method of sale, Ives had no way of identifying Cyclospasmol to the ultimate consumer other than by the color of the capsule and by the imprint on it. Defendants' fears, in addition to being defective legally, are factually without merit. The effect of this decision is not to give plaintiffs a monopoly over the color orange, but to prevent any other company from committing the torts of passing off an unprivileged imitation by producing dipyridamole in trade dress virtually indistinguishable from that of Persantine.

---

**36.** Defendant's president made an averment the court found telling: "he 'market[s] what the market wants.'" 478 F.Supp. at 609. That statement has its counterpart in this litigation, *e.g.,* Premo Proposed Finding of Fact 100 ("It is commercially necessary for a generic drug manufacturer to match the appearance of its brand name equivalent.") *See also,* Pharmadyne's Critique 27.

**37.** Throughout this lawsuit defendants have warned that to uphold plaintiffs' position would be to institute a monopoly on colors. *See* Premo's Proposed Conclusions of Law 31–34. The Third Circuit gave Premo's identical argument in *SK&F* short shrift. At 1064.

In *Ives Laboratories, Inc. v. Darby Drug Co., Inc., supra,* 601 F.2d at 643, the Second Circuit also considered the question:

■ From the outset of this case, the parties have disagreed as to whether plaintiffs have suffered and will suffer irreparable injury. On the basis of the record before me, I must conclude that plaintiffs have met their burden of showing they will be irreparably injured unless an injunction issues and that their remedy at law is inadequate.

One aspect of plaintiffs' irreparable injury concerns the difficulty in measuring their damages. Plaintiffs have lost sales to generic products. Tr. 48. It would be impossible to calculate the dollar value of sales lost to the defendants in the future because of defendants' unlawful behavior.[38] And plaintiffs' damages become even more speculative when lost good will is considered.

Given the obstacles likely to be encountered in calculating monetary damages, injunctive relief is necessary to protect plaintiffs' financial interests. *See Ives Laboratories, Inc. v. Darby Drug Co., Inc., supra*, 601 F.2d at 644; *A. H. Robins Co. v. Medicine Chest Corp., supra*, slip op. at 12.

The second aspect of irreparable injury involves the all-too-real possibility of Boehringer's being sued for something they did not do. Surreptitious substitution of look-alike dipyridamole for Persantine combined with a label inaccurately reading "Persantine" sets the stage for Boehringer being blamed for adverse patient reaction or a defective medicine, even though Boehringer's product was not dispensed. Judge Gibbons, in words highly pertinent here, discussed that possibility:[39]

> In such a suit the striking similarity in appearance of the two products would make it unlikely that SKF, the deep pocket defendant, could prove that the harm was caused instead by Premo capsules, because the only proof as to the source

would be the capsules themselves, long since digested by the patient.

*SK&F v. Premo*, at 1066. New legal developments, which increase the risk to a dominant company like Boehringer of being liable unless it can show that it did not manufacture the injury-causing product—a difficult feat when passing off has occurred and the substitute looks the same as the brand name product—make the need for an injunction even more pressing. *See, e.g., Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980).

The next variable is the balance of equities. Rarely will equities be balanced so heavily in favor of one of the sides. as is true here. Defendants began producing their dipyridamole months before the patent expired. When discovered, they meekly agreed to a consent injunction. No evidence was presented supporting their claim of patent invalidity, and I must believe that defendants acted in bad faith in jumping the gun. Defendants deliberately copied plaintiffs' trade dress. When asked to explain their conduct, they responded with a series of frivolous claims, noteworthy. more for their ingenuity than for their substance. The real reason for the copying lay not in any of these after-the-fact rationalizations, but in the desire to grab a large market share quickly. Imitating Persantine's trade dress aided that goal by enabling pharmacists to pass off generic dipyridamole as Persantine. This facilitation of passing off comprised a major element of defendants' marketing strategy.[40] Passing off has, in fact, occurred.

Defendant Premo complained, "If Premo is required to stop selling the product in the color in which all of its customers expect to receive the product, a loss of business in the

---

**38.** Because plaintiffs waived the bulk of the damages they have suffered, the trial dealt only with the question of liability. Therefore, no reason has existed to compute the easiest component of damages—sales already lost.

**39.** *SK&F*, of course, is not controlling. The court, acting on a motion for a preliminary injunction, had a limited scope of review; moreover, the record indicated that the look-

alike product was not bioequivalent. Lack of bioequivalence, which is not a factor here, may increase the risks of an adverse reaction. Nonetheless, Judge Gibbons' thoughtful analysis of the issue is still helpful.

**40.** As discussed earlier, defendants also directly encouraged substitution by pharmacists of generic dipyridamole for Persantine.

product will occur for the reason that Premo's customers, the drug wholesalers, expect to receive the product in the same color as Persantine." Memorandum in Partial Opposition to Plaintiffs' Motion for a Preliminary Injunction 36. Premo may lose sales as a result of this decision. But if the drop in sales takes place, it will be because pharmacists will no longer be able to profit by substituting defendants' products for the more expensive Persantine. This is hardly an interest that ought to be considered by a court of equity. Moreover, these illegitimate sales of defendants' products were obtained by diverting sales plaintiffs had earned through their diligent promotional activity. Rather than trying to gain sales through pushing their products' quality and price, defendants resorted to deception.[41]

Accordingly, the balance of equities weighs heavily on plaintiffs' side of the scale.[42]

The last factor that must be considered is the public interest. Here, too, *SK&F v. Premo* is highly instructive, for Premo's and Pharmadyne's arguments before this court closely parallel the arguments rejected by the Third Circuit.

In *SK&F*, Premo urged that the general federal policy of favoring competition and the desire for increased use of generic drugs underlying state generic drug substitution laws meant that public policy favored defendants' conduct. While accepting Pre-

mo's procompetitive premise, the court disagreed with Premo's conclusion.

Congress in section 43(a) of the Lanham Act and New Jersey in its common law of unfair competition have recognized that certain kinds of business activity, while promoting competition in the short run, are in the long run apt to be destructive of competition. The adoption of a distinctive trade dress as a means of identifying a product with its source is a legitimate means for the promotion of the user's business, and permitting piracy of that identifying trade dress can only discourage other manufacturers from making a similar individual promotional effort. Moreover allowing a manufacturer to be able to acquire and maintain a reputation for consistent good quality is certainly pro-competitive. Permitting a business climate in which substitutions of products over which the first manufacturer has no quality control in the long run can only discourage the effort to compete on the basis of reputation for quality.

*SK&F v. Premo, supra,* at 1067.

In trying to drape themselves in the mantle of free competition, defendants are disingenuous. Their decision to simulate plaintiffs' trade dress yields society no benefits. Plaintiffs have worked hard to promote Persantine. As the record shows, they have succeeded both in making their

---

**41.** Nothing in this opinion hampers defendants from competing fairly and honestly with plaintiffs. Defendants can advertise their products to wholesalers, physicians and pharmacists, requesting of the latter that they advise consumers of the change in medication and that the new medication will be of a different size, shape or color.

In communications with their wholesalers, defendants can highlight the efficacy and low cost of their products. Competition with plaintiffs can continue.

**42.** The Third Circuit found the equities tilting in the plaintiff's favor in *SK&F*.

It undertook the manufacture and sale of a patented product while the patent, never successfully challenged, still prohibited such activity. In the course of this undertaking, Premo could have chosen a dosage form other than powder contained in a gelatin cap-

sule. Even if it chose a powder and capsule dosage form, a vast number of single or bicolor capsule combinations other than those chosen were available for selection. In light of these factors, Premo's implausible suggestion that the choice of a maroon and white gelatin capsule was made for functional reasons was not credited by the trial court. Even now it is not enjoined from marketing the combination drug covered by the expired SKF patent in a dosage form different from DYAZIDE. The only answer that Premo made when confronted with these factors was, in essence, that it could compete more effectively in the diuretic market if it could use the same maroon and white capsule color adopted by SKF for DYAZIDE. Probably it could compete better still if it could appropriate the same trade name. But neither appropriation has the look, sound or feel of equity.

product widely known and in gaining a favorable reputation among physicians and pharmacists. To overcome these advantages enjoyed by Boehringer, defendants can stress the reasons why their generic product ought to be prescribed instead, *e.g.*, a quality product at a lower price. Aboveboard competition directed at factors such as quality and price is in society's interests. Obtaining sales by facilitating passing off is not. The effect of defendants' copying of Persantine is that sales earned by plaintiffs through hard work are lost to pharmacist greed.[43] The Lanham Act and New Jersey common law embody society's belief that that form of "competition" is socially undesirable, and may be restrained.[44]

Defendants' reliance on generic substitution laws is misplaced for several reasons. First, many generic substitution laws require that patients be informed of the substitution. The effect—indeed, the avowed purpose—of simulating Persantine's trade dress, is to prevent patients from knowing they have been given a generic product.[45] Second, patients have an "interest in protection from both inadvertent confusion and deliberate illegal substitution" of the generic product.[46] *SK&F*, at 1067. Finally, the raison d'etre of generic substitution laws is to give consumers equivalent pharmaceutical products at lower prices. Consumers who unknowingly receive a generic but pay brand name prices do not derive any of the benefits of the generic substitution laws. Simulation of Persantine's trade dress renders this deprivation of intended benefits possible.

Defendants maintain that their decision to copy Persantine's appearance benefits society. I do not believe "it would be somehow in the public interest to permit [defendants] either to facilitate passing off or to appropriate a nonfunctional trade dress that has acquired a secondary meaning," *SK&F*, at 1067, and therefore come to the contrary conclusion. Accordingly, I hold that the public interest favors enjoining the defendants from copying Persantine's appearance. *See A. H. Robins Co. v. Medicine Chest Corp.*, slip op. at 10.

To summarize: Defendants, by imitating Persantine's trade dress, have violated both the Lanham Act and New Jersey law. Plaintiffs will suffer irreparable injury as a result of defendants' conduct and their remedy at law is inadequate. The equities favor plaintiffs; so does public policy. Therefore, I find that plaintiffs are entitled to injunctive relief.

## VI

Not an issue in this case is whether the defendants' generic product has been cleared by the Food and Drug Administration as a new drug. For purposes of this litigation, I have regarded both the defendants' generic dipyridamole and plaintiffs' Persantine as being bioequivalent. To this extent this case is thus distinguished from *SK&F v. Premo, supra*.

Submit an order in conformity with this opinion.

---

**43.** It bears repeating that defendants not only anticipated pharmacist passing off, but depended upon it to achieve their financial goals.

**44.** Additionally, both the Lanham Act and New Jersey law prohibit copying nonfunctional trade dress that has acquired secondary meaning. Defendants, besides committing the tort of passing off, have violated this aspect of public policy as well.

**45.** *See* Tr. 96.

**46.** In *SK&F* the patent interest in not having substitution was greater than it is here because of bioequivalence problems. Nonetheless, it cannot be gainsaid that patients whose doctors have prescribed Persantine have an interest in being told that they are receiving instead generic dipyridamole.